**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Clinton S. PARKER, Jr., Defendant–
Appellant.**

No. 93–2006.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1994.

Decided May 24, 1994.

Andrew B. Baker, Jr., Asst. U.S. Atty., Daniel L. Bella (argued), Office of U.S. Atty., Dyer, IN for plaintiff-appellee.

Willie Harris, Karen M. Freeman–Wilson (argued), Gary, IN, for defendant-appellant.

Before COFFEY, FLAUM and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Clinton S. Parker ("Parker"), an Indiana State Trooper, was named along with four co-defendants in an eleven-count indictment. Count I charged him under 18 U.S.C. § 371 with conspiring to interfere with commerce

by committing a series of four armed robberies, with conspiring to transport stolen motor vehicles in interstate commerce, and with conspiring to receive or possess stolen vehicles in interstate commerce. Counts II through V charged him with interfering with commerce by means of four armed robberies in violation of 18 U.S.C. §§ 1951–52. Counts VI through IX charged him with the use of a firearm in four crimes of violence in violation of 18 U.S.C. §§ 924(c)(1) and (2). Counts X and XI charged him with possession of a stolen vehicle that had crossed state lines in violation of 18 U.S.C. §§ 2313 and 2. Pursuant to a plea agreement, Parker pled guilty to Counts I, II, III, IV and VI. He was sentenced to sixty months in prison on Count I; to 210 months on each of Counts II, III and IV, all to be served concurrently with each other and concurrently with the term imposed on Count I; and to sixty months on Count VI, to be served consecutively to the terms imposed on the first four counts for a total term of 270 months. The defendant was also ordered to serve three years of supervised release, to make restitution in the amount of $137,545, and to pay a special assessment of $250.

On appeal, Parker asks us to reverse and remand for resentencing on the grounds that the trial court erred in enhancing his sentence upon finding that he (1) was a leader or organizer under U.S.S.G. § 3B1.1(a); (2) obstructed justice under U.S.S.G. § 3C1.1; and (3) abused a position of trust under U.S.S.G. § 3B1.3.

We affirm in part and reverse in part.

## I. BACKGROUND

The appellant admits to having helped plan and participate in four armed robberies while employed by the State of Indiana as a State Trooper. The first armed robbery took place in July 1991 when Parker, acting as a leader, had his accomplices hold up an Illinois Armored Car courier at a Builders Square store in Hammond, Indiana. The defendant Parker initially discussed the possibility of robbing this armored car courier with co-defendant Edgar Rogers ("Rogers"), who in turn recruited four additional co-conspirators.

Parker, whose wife was employed at Builders Square, was aware of the Armored Car courier's schedule, procedures and the amount of money he would be carrying, and conveyed this information gained from his wife to his co-conspirators. While assisting in planning the robbery, Officer Parker estimated the police response time for the robbery and also provided his accomplices with a police scanner, his service revolver and his personal firearm. Parker also admits to using his patrol car to transport the conspirators to various sites where he permitted them to "test fire" his weapons and to engage in target practice. Finally, Parker accompanied his confederates on at least two of four "dry runs" in which they rehearsed their planned holdups. On the day of the initial robbery, the defendant remained behind while Rogers drove a stolen getaway car to the scene of the crime, where two other co-defendants entered the Builders Square and robbed the Armored Car courier at gunpoint. The gunmen divided the loot, setting aside a smaller share for Parker on the theory that he was entitled to less money because he had taken fewer risks. The robbers subsequently returned the weapons to Parker.

Several months later, Officer Parker drove Rogers to Illinois in order that he might steal a van for the second robbery, and once again he loaned his police service revolver. The second holdup of the same Armored Car courier at the same Builders Square store in Hammond took place in October 1991. As in the first robbery, Parker again shared in the proceeds although he was not physically present at the scene of the robbery.

Parker and his fellow conspirators next decided to rob a ValuMart store in Gary, Indiana, in their statewide crime spree. In January 1992, the defendant drove Rogers to Illinois to steal another getaway car. Shortly thereafter, while in uniform and on duty, Officer Parker met with his co-conspirators some distance from the holdup scene, gave them his police revolver as well as a police scanner and waited in his patrol car for their return. After the robbery, Rogers and the three other accomplices once again rendezvoused with Parker. All except Rogers got out of the getaway car and entered Parker's

vehicle. Defendant Parker and Rogers then drove their respective cars to a remote location where they torched the stolen getaway vehicle with a warning flare taken from the squad car. Parker then conveyed his accomplices in his police vehicle to the residence of one of the conspirators, where they divided the loot.

The fourth and final robbery was accomplished in February 1992 after Parker drove Rogers to Griffith, Indiana, where Rogers stole a pickup truck to use as another getaway vehicle. While Rogers served as the getaway driver, two other conspirators robbed an Armored Car courier at a K–Mart in Merrillville, Indiana. Once again, Parker did not accompany his co-conspirators to the scene of the crime, but lent them his police revolver as well as his police scanner and remained at home during the robbery. One of the robbers, Lawrence Richmond, was caught while trying to escape on foot with the stolen cash. According to the presentence report, Parker was arrested on May 22, 1992 and was subsequently indicted on June 22, 1992 by a grand jury on eleven counts in connection with the above crimes.

Parker then agreed to plead guilty to five counts and to cooperate with the U.S. Attorney by providing additional information concerning the crimes and testifying truthfully at any future trials. The government in turn agreed to dismiss the remaining six counts at the time of sentencing. The court accepted the defendant's guilty pleas to five counts, and Parker thereafter testified on behalf of the government at the trial of co-defendant Roy Lee Vinson, Jr. ("Vinson"). Parker's sentencing hearings were held in March and April 1993, and at this time the court granted the government's motion to dismiss the remaining six counts in the indictment and reduced Parker's base offense level by two levels to reflect his acceptance of responsibility. The court also increased the defendant's base offense level by four levels for being an organizer/leader of a criminal activity involving at least five participants (Guideline § 3B1.1); by two levels for obstructing justice (Guideline § 3C1.1), and by two levels for abusing a position of trust (Guideline § 3B1.3), resulting in an adjusted offense

level of 37 and a prison sentence totaling 270 months.

## II. ISSUES

The defendant contends that the trial court erred in increasing his offense level for being a leader or organizer of criminal activity involving five or more participants under Guideline § 3B1.1(a), for obstructing justice under Guideline § 3C1.1, and for abusing a position of trust under Guideline § 3B1.3.

## III. DISCUSSION

When reviewing sentences imposed under the Sentencing Guidelines, courts of appeal shall:

> "Give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts."

18 U.S.C. § 3742(e).

### A. "Organizer or Leader" Role

Guideline § 3B1.1(a) provides that a defendant's offense level should be increased by four levels based on his role in the offense "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The trial court stated at Parker's sentencing hearing that it found him to be an organizer and leader within the meaning of Guideline § 3B1.1(a) because he

> "[d]id meet with the co-defendants in advance of the robberies. He outlined plans for the Builders Square and ValuMart robberies. He provided the weapons used in the robberies. He was familiar with the layouts of Builders Square and the ValuMart establishments, and the courier procedures and the security at the Builders Square; and he conveyed all of the information to his co-defendants. Also, the number of people that were involved in the conspiracy, which encompasses all of the robberies involved in this case, totaled six participants."

The defendant carries a heavy burden in seeking to overturn the district court's finding on this issue, for we have held that the trial judge's determination of whether a defendant was an "organizer" or "leader" under Guideline § 3B1.1(a) is "a fact question for the sentencing court to resolve, and we will not disturb it absent a showing of clear error." *United States v. McKenzie*, 922 F.2d 1323–1329 (7th Cir.1991) (citations omitted). This standard of review makes clear that we may not hold that the trial judge erred unless we are of the "definite and firm conviction that a mistake has been committed." *United States v. Brown*, 900 F.2d 1098, 1102 (7th Cir.1990) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Moreover, "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 1102.

According to Application Note 3 to Guideline § 3B1.1(a), among the factors the court should consider in determining a defendant's role in an offense are:

> "The exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing of the offense, the nature and scope of the illegal activity and the degree of control and authority exercised over others."

U.S.S.G. § 3B1.1, comment. (n. 3).

In an attempt to demonstrate that the trial court committed clear error in determining that he was an organizer or leader, defendant Parker initially argues that the conspirators' plans and decisions were made as a group rather than by Parker alone. Our review of the transcript reveals that this assertion is somewhat misleading because co-defendant Leo Reese ("Reese") testified at Officer Parker's sentencing that the robbers made "a lot" of their decisions as a group but also that "the initial idea was Mr. Parker's. He provided the site, the information, and the weapons with which to carry this out." Reese further testified that Parker had proposed other robberies in addition to the four that he participated in, that Parker drove him to view these potential targets, and that without Parker the first robbery "never would have happened."

In further support of his argument that he should not be sentenced as a leader or organizer, Parker claims that he only participated in two of the four "dry runs" in which the defendants practiced their first robbery. But we fail to understand how the defendant's admission that he did attend and participate in at least two "practice" robberies supports his argument, for it is undisputed that Officer Parker and his co-conspirators always agreed that Parker would remain away from the actual robbery scene while his co-defendants did the "dirty work." This arrangement also accounts for the defendant's third contention: that he received a smaller share of the robbery proceeds than did his co-conspirators and that therefore he should not be deemed a leader or organizer. We observe that Reese testified at the defendant's sentencing hearing that the reason Parker's co-conspirators set aside a smaller share of the take from each robbery for Officer Parker than they awarded themselves was that Parker did not physically accompany them during the robberies and so did not share the same risks. Parker next claims that his co-conspirators also provided their own firearms for use in the robberies and that this too demonstrates that he was not a leader or organizer. We do not think this alleged circumstance has any bearing on whether or not Parker was a leader or organizer. But even if it did, we note that Parker's testimony was that he only found out "later" that his confederates had "extra weapons" in addition to the ones with which he provided them, which strongly suggests that both he and the other conspirators viewed his role as a weapons provider (and instructor) as crucial to the success of the conspiracy.

Parker's final argument that he was not a leader or organizer is that he did not personally recruit the additional members of the conspiracy, but instead left that task to Rogers. (Parker testified that the *reason* Rogers did the recruiting was that "I didn't know people.") While we might agree that this

evidence suggests that Rogers also played an important role in the conspiracy, the issue of Rogers' role in the conspiracy is not before us. We agree with the trial court's determination that, regardless of what role Rogers may have played, Parker played a key role in planning and organizing the robberies, and was therefore properly sentenced as a leader/organizer. *See United States v. Boula,* 997 F.2d 263, 265 (7th Cir.1993) (holding that there may be more than one organizer or leader of a conspiracy).

In sum, the record demonstrates (1) that Parker first proposed the robbery spree, (2) that because he "didn't know people," he agreed to allow Rogers to recruit the additional members of the conspiracy, (3) that he provided the group with weapons, information, a police scanner and transportation without which the conspiracy would not have been carried out, and (4) that he received money from each hold-up while remaining removed from the scenes of the crimes. Because we agree with the trial court that Parker was a leader or organizer of the conspiracy, we hold that the court did not err in enhancing the defendant's sentence pursuant to Guideline § 3B1.1(a).

### B. Obstruction of Justice

■ Parker also contests the trial court's decision to increase his offense level by two levels on the grounds that he obstructed justice by giving false testimony at his plea hearing.

Guideline § 3C1.1 provides that:

"If the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase [the offense level] by two levels."

■ Application Note 3 provides in relevant part:

"The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:

\*    \*    \*    \*    \*    \*

(b) committing, suborning, or attempting to suborn perjury; \* \* \*"

U.S.S.G. § 3C1.1, comment. (n. 3). At the sentencing hearing, the trial judge explained his imposition of the § 3C1.1 sentencing enhancement, stating that he found Parker "did obstruct justice by lying about the amount of money he received from the robbery at his plea hearing." We review this determination for clear error. *United States v. Cantero,* 995 F.2d 1407, 1413 (7th Cir.1993).

Initially, the record reveals that, at his plea hearing, the defendant testified in response to the trial judge's questions as follows:

"[The Court] Okay. Did you ever get paid for your participation in [the first Builder's Square] robbery as far as the proceeds from the robbery?

[Parker] Yes, I did.

Q. How much did you get from that robbery?

A. $200.

Q. $200?

A. $200."

Our examination of the transcript of Parker's subsequent testimony at the trial of co-defendant Vinson confirms the trial court's finding that the above testimony was less than truthful:

"[AUSA] Mr. Parker, when you pled guilty, did you tell the court some of the facts of these cases that we've discussed here today?

[PARKER] Yes, I did.

Q. And did you tell the court the accurate amount of money you received from the first Builders Square robbery?

A. No, I did not.

Q. Do you recall what amount you said that day when you pled guilty?

A. 200.

Q. And how much did you really get from that robbery?

A. 1252. $1252.

Q. What—why did you say 200 the other day?

A. I was ashamed.

\*    \*    \*    \*    \*    \*

Q. It's your testimony that you lied to Judge Moody [at the plea hearing], is that correct?

A. Yes."

On appeal, Parker does not deny that he testified falsely at his plea hearing, but insists that this false testimony did not amount to obstruction of justice because (1) he did not intend to obstruct justice, but only intended to minimize his embarrassment by understating the amount of money he received, and (2) the government did not rely on his false testimony by expending resources pursuing the false information he provided the court. The government does not contend that Parker's false testimony caused it to expend any additional resources. Instead, it argues that this testimony "clearly constitutes perjury—a deliberate lie under oath," and that perjury constitutes obstruction of justice under Guideline § 3C1.1 regardless of whether or not it caused the government to expend resources.

■ While we agree with the government that Guideline § 3C1.1 does not require it to demonstrate that the defendant's false information caused it to expend "great resources," *United States v. Stevenson*, 6 F.3d 1262, 1269 (7th Cir.1993), the question remains whether his testimony constituted perjury as the government contends. For although the trial court did not specifically characterize Parker's false testimony as "perjury," this theory that Parker committed perjury at his plea hearing was the sole basis upon which the government sought the obstruction of justice enhancement at sentencing and it remains its sole argument on appeal. Moreover, our review of Guideline § 3C1.1 has not uncovered any other possible basis for the trial court's finding that Parker "did obstruct justice by lying about the amount of money he received from the robbery at his plea hearing." Therefore we will address the government's contention that Parker's false testimony at his plea hearing regarding the size of his take from the first Builders Square robbery constituted perjury within the meaning of Guideline § 3C1.1, Application Note 3(f).

■ After examining the record [1] to ascertain whether "[t]he district court's determination ... encompasses all of the factual predicates for a finding of perjury," *United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993), we are convinced that the defendant did not commit perjury because his false testimony did not concern a material matter. While materiality is not an element of false swearing,[2] the law is clear that perjury requires proof that the witness's false testimony concerned a *material* matter "designed to substantially affect the outcome of the case...." *Id.* at ——, 113 S.Ct. at 1117. The Guidelines commentary to § 3C1.1 provides that a "material" statement is one which, "if believed, would tend to influence or affect the issue under determination." Guideline § 3C1.1, comment. (n. 3). This circuit's perjury cases have always been in accord with the Supreme Court and Guideline definitions of "material matter." *See, e.g., United States v. Pitz*, 2 F.3d 723, 731 (7th Cir.1993) (drug defendants committed perjury when they sought to reduce their sentences by giving false testimony regarding the amount of drugs involved); *United States v. Rodriguez*, 995 F.2d 776, 779 (7th Cir.1993) (upholding obstruction of justice enhancement where trial court characterized drug defendant's false testimony as "going to the very heart of the case"); *United States v. Easley*, 977 F.2d 283, 286 (7th Cir.1992) (upholding obstruction of justice for perjury where drug defendant's testimony was false at "several critical junctures" regarding the drug transaction and the government's alleged efforts to entrap him); *United States v. Cochran*, 955 F.2d 1116, 1125 (7th Cir.1992) (affirming sentence enhancement for perjury where drug defendant falsely testified on unspecified "essential evidentiary matters" and "lied about relevant facts at trial").

---

1. We observe that it would have aided our review of this issue if the trial court had "address[ed] each element of the alleged perjury in a separate and clear finding," *United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993).

2. *See, e.g.,* Wis.Stat.Ann. § 946.32(1)(a) (West 1982), providing that a witness commits false swearing when he "under oath or affirmation makes or subscribes a false statement which he does not believe is true, when such oath or affirmation is authorized or required by law...."

We note that in the case before us the government's position at sentencing, as stated in the presentence report adopted by the trial court, was that while the prosecution was of the opinion that Parker's sentence should be enhanced on the grounds that he obstructed justice by committing perjury:

> "the government does not view the obstruction significant enough to warrant denying Parker the downward adjustment for the acceptance of responsibility. *The perjury was not related to a material issue, according to the government,* and Parker later recanted the perjury." (emphasis added).

Apparently recognizing the self-defeating nature of that argument (as just discussed, if Parker's alleged perjury did not relate to a material issue, it was not "perjury"), the government now contends without citation to any authority that the size of the defendant's share from the first Builders Square robbery *was* somehow "a material part of his basis in fact for the plea, as well as material under § 3B1.1 for his role in the offense." We reject this contention. We think it clear that Parker's false testimony regarding the size of his "take" from the first robbery was not "designed to substantially affect the outcome of the case" and that it therefore did not concern a "material" matter. *Dunnigan,* — U.S. at ——, 113 S.Ct. at 1117. Because the defendant frankly admitted that he was guilty of all the counts relating to the first Builders Square robbery (Counts I, II, and VI), we do not think his understating the size of his share of the proceeds from that robbery could have affected the outcome of his guilty plea. Whether his actual take from the first robbery was $200 or $1,252 was irrelevant to his guilt or innocence of armed robbery because the amount of money he obtained was not an element of the crimes with which he was charged.[3] As already discussed in Section 3A of this opinion, we are also convinced that the district court did not rely upon the size of Parker's share in the proceeds in determining that he was a "leader or organizer" of the conspiracy under Guideline § 3B1.1. Moreover, the government does not dispute the defendant's claim that he testified truthfully at his sentencing hearing, recanting the false testimony he had presented at his plea hearing and providing the sentencing court with an accurate accounting of the cash he received from each robbery.

In sum, after reviewing the record we are convinced that Parker's false swearing at his plea hearing did not amount to perjury because the size of the defendant's share of the proceeds from the first robbery was not "material" within the meaning of the federal perjury statute. Accordingly, we hold that, on the facts of *this* case,[4] the trial judge erred in enhancing the defendant's sentence that Parker "did obstruct justice [under Guideline § 3C1.1] by lying about the amount of money he received from the robbery at his plea hearing."

### C. Abuse of Trust

■ The sentencing judge also enhanced the defendant's offense level for abusing his position of trust as an Indiana State Trooper under Guideline § 3B1.3, which provides:

> "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by two levels...."

In deciding to enhance Parker's offense level under this section of the Sentencing Guidelines, the district court found that the defendant:

> "did, in fact, abuse his position of trust as an Indiana State Police Trooper. The de-

---

**3.** Robbery is "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

**4.** On different facts, we might well reach a different result. If, for example, the defendant had objected to receiving an "organizer or leader" enhancement on the grounds that his share of the robbery was only $200, the trial court might have been more than justified in finding an obstruction of justice.

fendant at the time of the commission of these crimes was a Trooper with the Indiana State Police. During the Valu-Mart robbery he was in uniform. He used his police car when he transported his co-defendants from the area of the commission of the robbery to a location where the stolen vehicle used in the robbery was burned by the use of his police issue flare. Further Parker gave his co-defendants the time it would take the police to respond to the alarm at the Builders Square robbery."

On appeal, Parker argues that according to the commentary to Guideline § 3B1.3, he cannot be held to have abused his position of trust because his position as a Trooper did not "substantially" facilitate the robberies or their concealment. Application Note 1 states that:

"The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller."

U.S.S.G. § 3B1.3, comment. (n. 1). In this regard, Parker makes two points: (1) although he was in uniform and on duty when he transported the robbers in his police vehicle after the ValuMart robbery, the police were not in "hot pursuit" and he was not using his vehicle as a "decoy," and (2) that although he permitted Rogers to use his police flare to burn the getaway vehicle, "the same feat could have been accomplished with matches or gasoline."

We note at the outset that Officer Parker admits he provided his co-defendants with police response times and a police scanner in the course of planning the first Builders Square robbery. This court has recently held that enhancement under Guideline § 3B1.3 is appropriate when the defendant is a police officer who "used the information he derived from being a police officer to conceal the illegal activities of himself and his co-conspirators." *United States v. Gould*, 983 F.2d 92, 94 (7th Cir.1993). Thus, we are convinced that even if Parker had done no more than provide his co-conspirators with police response times and a police scanner

the district court would have been justified in enhancing his sentence for abusing his position of trust.

Yet in this case it is undisputed that the defendant abused his position as a police officer in numerous other ways as well. Before the ValuMart robbery, for example, Parker was on duty, in uniform and in his marked police car when he met his confederates and supplied them with his official service weapon for use in the holdup. (We note that the presentence report states that Parker's co-conspirators did more than brandish this revolver, but actually pointed Parker's police gun at the head of their victim, and that the trial court found "by a preponderance of all credible evidence that in these robberies the Defendants pointed the gun at one victim in particular [and] gave the victim particular instructions.") The defendant waited in his police car for the robbery to be completed, met the conspirators once again, and transported three of them in his marked car to a remote location where the stolen getaway vehicle was torched with Parker's police flare. Officer Parker then transported all of his co-conspirators to a house where they divided the proceeds amongst themselves. We have no doubt that the defendant's use of his police car and police flare significantly facilitated both the commission and the concealment of their crime within the meaning of Guideline § 3B1.3. Therefore we hold that this evidence, when combined with Parker's own testimony that he provided his co-conspirators with police response times, a police scanner, and his police weapon, was more than sufficient to support the trial judge's finding that the defendant had abused his position of trust as an Indiana State Trooper.

As we observed in another case involving a government employee:

"[P]olice officers are accorded public trust to enforce the law. The public, including fellow law enforcement agents, expect that police officers will not violate the laws they are charged with enforcing. [The defendant] took advantage of that trust to make it easier for her to conceal criminal activity. We believe that this is precisely the

type situation contemplated by § 3B1.3 as an abuse of public trust."

*United States v. Lamb,* 6 F.3d 415, 421 (7th Cir.1993) (quoting *United States v. Foreman,* 926 F.2d 792, 796 (9th Cir.1990)).

## CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part, and we remand for resentencing in accordance with this opinion.

REMAND.