**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gary SENN, Joseph L. Marino, Nathan Thomas Cannon, Alfred DeStefano, and John Weaver, Defendants–Appellants.**

Nos. 96–3373, 96–3374, 96–3375, 96–3438 and 96–3484.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1997.

Decided Nov. 6, 1997.

Robert W. Kent, Jr. (argued), Office of the United States Attorney, Criminal Division, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Michael B. Mann, Zavislak & Mann, Oakbrook, IL, for Defendant–Appellant Gary Senn.

Paul Bradley (argued), Chicago, Il, for Defendants–Appellants Gary Senn and Joseph L. Marino.

David G. Duggan (argued), Chicago, IL, for Defendant–Appellant Nathan T. Cannon.

Douglas P. Roller (argued), Roller & Associates, Chicago, IL, for Defendant–Appellant Alfred DeStefano.

Robert S. Bailey (argued), Chicago, IL, for Defendant–Appellant John Weaver.

Before POSNER, Chief Judge, and MANION and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

*Congratulations Mrs. Gertrude Gullible— this is your lucky day! Have a seat, take a deep breath, relax, and hold onto your hat because I've got incredible news for you. It's my great honor, Mrs. Gullible, to tell you that you've just won (drum roll, please) $100,000 in the Publisher's Clearing House Sweepstakes! I'm sorry Ed McMahon*[1] *is not telling you this amazing news himself. But don't worry—he'll be at your front door on Friday to personally deliver this fabulous cash prize to you.*

*Publisher's Clearing House asked me to call you, as a courtesy, before they officially announce this prize because they want you, not Uncle Sam, to enjoy this money. As I'm sure you know, this prize will cause you to face a huge tax bill. Luckily, however, the tax laws have some loopholes, and we want you to take advantage of them. I represent an accounting firm, Leland Industries, that specializes in solving tax problems for Publisher's Clearing House winners. We can take advantage of the tax laws and allow you to save a big portion of your tax liability by going through an account we have established at Publisher's Clearing House. You must act immediately, however, because you will lose the tax savings we can offer as soon as Publisher's Clearing House officially announces that you have won the prize.*

*Here's what you need to do. You must send a cashier's check for $5,900 to our office in Michigan by using the Post Office's one-day express mail. If we get your check tomorrow, we will finish the paperwork, and the $5,900 will satisfy your entire tax bill. If you don't act in time, your tax bill will be $39,000 next April 15. That will leave you with a prize of $61,000 instead of $94,100.*

*One other thing, I'm sorry we had to call in advance and ruin the surprise that is coming to you on Friday, but last year an elderly gentleman suffered a heart attack when Ed McMahon and the TV crew arrived at his front door. For that reason, and the tax savings we can offer, Publisher's Clearing House now calls all winners ahead of time. One last thing, for everyone's safety, you need to keep this news confidential. We want you to enjoy your big day without an unruly crowd gathering outside your house on Friday.*

The FBI does not actually have this scam on tape, but this was the gist of the pitch employed by John Weaver as part of a "fraudulent telemarketing operation", the first of three conspiracies charged in this case. The telemarketing conspiracy started in September of 1993 with Alfred DeStefano and Barry Duncan. They planned to use the phone operation to raise money to finance the second conspiracy—the importation of marijuana from Jamaica to Florida. The third conspiracy entailed plans to distribute the marijuana. In total, the telephone fraud scheme defrauded 73 victims and separated them from $380,000. Weaver alone obtained $282,000 from 38 victims. However, as shall become clear as this story unfolds, the success of the telemarketing operations con-

---

1. No doubt a true devotee of sweepstakes would smell a rat: Ed McMahon, along with his pal, American Bandstand's Dick Clark, represents American Family Publishers, not Publisher's Clearing House.

trasts dramatically with the ineptitude of the drug smuggling endeavors.

Before getting to the meat of the case we pause to note that the telephone scheme preyed upon senior citizens, especially elderly folks who recently lost a spouse or incurred significant medical expenses. While this all too common form of fraud is classified as an economic crime, let no one doubt the emotional pain inflicted on the victims. As one of the bilked elderly reported:

> It's difficult to explain how this case has affected me personally. I know that prior to that day in mid November, 1993, when I received a phone call advising me that I had won $100,000 in a Publisher's Clearinghouse Sweepstakes, I was optimistic, cheerful and believed that most people told the truth. Now I know I was simply stupid, gullible and naive. I'm less optimistic, I question my own common sense and I'm suspicious of everyone. Frankly, I liked myself much better before that fateful phone call.

Now let's get to the facts. After it got underway, the telemarketing conspiracy, and eventually the marijuana conspiracies that followed, grew to include a large cast. Some conspirators were only involved in telemarketing, while others were in the marijuana venture as well. In late September Weaver joined the telemarketing conspiracy and introduced the Publisher's Clearing House pitch. He continued making phone calls from his home in Michigan through January of 1994. Weaver and the other telemarketers told their victims to send cashier's checks to various mail drops, mostly in the Chicago area. Duncan then had the checks collected and deposited into an account opened by DeStefano in Chattanooga. The funds ended up with Duncan in Dallas. He agreed to pay the telemarketers a substantial percentage of the take as commissions. Weaver claims, however, that he did not receive commissions that he earned.

By November of 1993 the telemarketing scam raised enough money to begin the marijuana stage of the plan. By this time, Weaver claims that Duncan owed him about $20,000. Duncan offered to turn the "$20,000 into $100,000" if Weaver would let him hold the money a little longer. Weaver agreed, even though he did not know how Duncan would perform this straw-into-gold feat.

In the meantime DeStefano left the telemarketing racket to begin organizing the drug smuggling scheme. He began by recruiting a mechanic to find and repair a used boat able to make it to Jamaica and return back to the USA with 5,000 pounds of marijuana. Next, he obtained the assistance of Gary Senn to ready the boat and, later, crew it with DeStefano on the trip. Eventually DeStefano located a vessel—a 45-foot fishing boat, the Pelican II-in Key Largo, and he arranged for Duncan to purchase it. Duncan arrived in Florida and bought the boat for the remarkable price of $2,500, although he did supply $8,000 for repairs. DeStefano—clearly a fan of Bud Light advertising-renamed the boat the "Yes I Am."

Next, DeStefano recruited Nathan (Tommy) Cannon to help with the marijuana operation. Cannon and DeStefano were old friends—they even worked together in the past smuggling marijuana from Jamaica along with Joseph L. Marino. DeStefano explained to Cannon that, in this operation, Marino would arrange the purchase in Jamaica and set up buyers in Florida. DeStefano further explained that he would "captain the trip" to Jamaica, and he asked Cannon to come with him. Cannon, who at the time worked as a carpenter and apartment manager in Hollywood, Florida, agreed to join the enterprise, but he refused to sail to Jamaica, apparently because he didn't want to leave his pregnant girl friend, Joyce Williams, who is now his wife, behind. DeStefano explained that the telemarketing operation would fund the marijuana venture and that Duncan would act as the financier.

Cannon emerged as the "communications point-man" for the marijuana conspiracy. Marino did not want to communicate directly with Duncan because of the telemarketing paper trail, so Cannon acted as the liaison. In fact, Cannon would not even give Marino's Chicago phone number to Duncan. Cannon coordinated daily calls between DeStefano and Duncan, and later, during the smuggling operation, he orchestrated a number of wire transfers.

By March of 1994 the conspirators had the "Yes I Am" ready to sail, and DeStefano and Senn began the trip to Jamaica. Customs documents for the trip listed DeStefano as the "captain" of the "Yes I Am." Unfortunately the seafarers encountered problems, many of them related to the questionable seaworthiness of the boat, others to their uncertain abilities as seamen. They had to stop in Key West for repairs (Duncan wired $1,000); they had to stop in Cancun for repairs (Duncan wired more money); they had to ask directions to the Cayman Islands from a freighter in the middle of the Caribbean; they had to stop in the Caymans for extra fuel (Duncan wired yet more money); and finally, they had trouble locating Jamaica. Each time they needed money they contacted Cannon, who arranged for financing from Duncan who, in the meantime, arrived in Florida where he spent his time regaling Cannon with stories about telemarketing, notably Weaver's successes.

When they arrived in Jamaica they faced more difficulties. Because of hurricane damage, the fishing canal leading to the meeting place—"Rick's Cafe"[2]—was too narrow to accommodate the "Yes I Am." Of course, they needed yet more repairs, and because of their navigation difficulties in finding Jamaica they needed a global positioning device to find their way home.

Back in Florida, Cannon contacted Marino to set up an alternate meeting site. Then he flew to Jamaica with the navigation equipment and $5,500 in cash for the marijuana. He stayed for four days while DeStefano attempted to buy 1,000 pounds of pot, but he didn't have enough money. In response, Duncan wired an additional $1,000 or $1,500. DeStefano ended up spending this money on fuel and supplies. Eventually the operatives in Jamaica contacted "Sparks," a Jamaican bicycle shop owner and marijuana dealer. Sparks offered them 500 pounds of "D class" marijuana or a lesser amount of "A class" marijuana. The conspirators bought the higher quality pot and weighed it, wrappings

and all, on a hanging fish scale: it weighed, according to Cannon's trial testimony, 260 pounds. That night they loaded the weed onto the "Yes I Am" and set sail. During the voyage home (Cannon flew) the boat stopped in Mexico to buy extra fuel, for which Duncan again wired money.

In Florida, Cannon hired Paul Reidy to help unload the marijuana and drive it in Reidy's van to Cannon's home in Hollywood. Duncan paid Reidy $5,000 plus $500 for repairs to the van. While Cannon and Reidy drove to the Keys they received word that, while the global positioning device helped the seamen reach Key West, the boat was sinking because of a broken shaft. They hurried to Key West to unload the boat. Duncan also headed to Key West. He arrived and discovered that the unloaders had left one of the bales of marijuana laying on the dock. He placed the bundle in his car and began the return trip to Cannon's apartment.

When the conspirators arrived back in Hollywood they stored the marijuana in one of the apartments that Cannon managed. Cannon took a couple pounds for himself. The venture then entered the distribution phase—they hoped to sell the pot for $1,000 a pound. The schemers notified Marino, who purchased a plane ticket in Chicago and flew to Florida.

Marino arrived, inspected the marijuana, rolled a joint, smoked it, then took a shower. Afterwards he pronounced the marijuana very good and said he was impressed. Next he began searching for the buyer-his friend "Rock" who lived in Redlands. Marino could not find Rock's house in the dark; he tried again but failed in daylight. Apparently he gave up because, before leaving to fly back to Chicago, he promised to send his son, Joseph A. Marino, to pick up 20 pounds for resale in Chicago.

This version of the Marino saga is contradicted by Leslie Tolliver, Duncan's girl friend, who witnessed many of the events in

---

2. This "Rick's Cafe", unlike the famous "Rick's Cafe", was on water. Recall the lines:

Humphrey Bogart (Rick Blaine, the owner of "Rick's Cafe"): I came to Casablanca for the waters.

Claude Rains (Capt. Louis Renault): The waters? What waters? We're in the desert!

Bogart: I was misinformed.

Florida. She testified that Marino was spoken of much, but never seen. She said that DeStefano claimed he was "laying low" or had refused to participate. At trial, based on this testimony and on Cannon's testimony about Marino's reluctance to deal directly with Duncan, Marino argued that he did not actually participate. He claimed that DeStefano and Cannon fabricated his role in order to bilk money out of Duncan to fund their drug habits.

Meanwhile, Weaver arrived in Florida with his girl friend and her 6–year–old son "for a vacation." By then he knew (he said) that Duncan used his money to finance marijuana smuggling. While he waited for Duncan to pay him, he stayed for several days in a vacant apartment managed by Cannon. Not surprisingly, Weaver and Duncan had an altercation over Weaver's money. Because the marijuana enterprise had not met with success, Duncan had no money to give Weaver. He ended up persuading Weaver to accept 40 pounds of marijuana, which Cannon put in the trunk of Weaver's rented car. Weaver claims that he had Cannon remove the marijuana because Weaver's girl friend objected to having it in the car with her son. At trial, Weaver's girl friend testified to this version of the facts, while Cannon testified that he did not remove the marijuana. In any event, Weaver departed the next day.

Two days later the FBI arrested Duncan for the telemarketing scam, and shortly thereafter agents tried to arrest DeStefano. Cannon, Reidy, Senn, and DeStefano moved the remaining marijuana, went into hiding, and later sold the pot to Marino's son and others at fire sale prices. DeStefano and Cannon used the proceeds to support their drug habits and pay Duncan's attorney.

On September 22, 1994, a grand jury indicted several defendants, including DeStefano, Duncan, Weaver, Senn, Cannon, and Reidy, for conspiracy to commit mail fraud, wire fraud, and money laundering; conspiracy to import marijuana; and for the substantive offenses of wire fraud and money laundering. Prior to obtaining the assistance of appointed counsel, Weaver testified before the grand jury and admitted his involvement in the telemarketing operation and his agreement to accept marijuana. In a superseding indictment the government added Marino as a defendant and amended the charges to include a count of conspiracy to distribute marijuana.

Nine of the 12 defendants charged in the case entered guilty pleas. Weaver, Senn, and Marino proceeded to trial before District Judge Ann Claire Williams. Although some counts were dropped, the jury convicted Senn and Marino of conspiracy to import and conspiracy to distribute. Weaver was convicted on telemarketing counts and on conspiracy to distribute but acquitted on the conspiracy to import allegation. Weaver, Senn, and Marino now appeal their conviction. Weaver, DeStefano, and Cannon appeal their sentences.

The defendants who went to trial—Weaver, Senn, and Marino—seek relief for three reasons. First, they say the government violated its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); second, they claim that Judge Williams erred by refusing to receive a tape-recorded conversation involving Cannon and Williams (recall, she was Cannon's girl friend and is now his wife) into evidence; and third, they point to an objectionable closing argument by the prosecutor that "commented on the fact that (they) did not testify." We'll consider the *Brady* issue first.

Cannon, no doubt, was the government's star witness on the marijuana charges. The defendants say he was the "linchpin" of the prosecution's case, and we won't argue with that characterization of his role. And, as expected, the defendants' lawyers did their level best to dirty him up for the jury. They cross-examined him extensively about his favorable (in their view he received "tremendous reductions") plea agreement and a variety of bad acts, including a conviction for passing a batch of bad checks, drug use, and several violations of probation, and they also harped on a number of inconsistencies in his account of the marijuana venture.

The alleged *Brady* violation involved the accuracy of part of Cannon's criminal record. Cannon testified that his probation for passing bum checks was revoked because he

didn't pay, or fell behind in paying, restitution. But after the close of evidence, just prior to closing argument, defense counsel received a copy of Cannon's criminal record obtained by a defense investigator who requested the documents from the Broward County, Florida, circuit court clerk's office. The defendants had requested these documents the previous week. The file revealed numerous parole violations, including a charge for sexual assault. The file also disclosed that Cannon had paid no restitution whatsoever. The packet also showed a 1993 arrest for possession of the stolen vehicle. (Later, the parties learned that there was an outstanding warrant for Cannon's arrest on that charge.) Crucially, the packet contained a letter from the FBI asking the clerk to send the record to the agency's case agent in Chicago. The letter contained a notation by the clerk's office that it had sent the requested material to the FBI on January 3, 1995. The government, however, never produced this record for the defense as part of its response to earlier discovery requests.

■ The defendants told Judge Williams about their discovery, and they asked for a hearing to determine whether the government committed a *Brady* violation. The judge granted the request but stated that the hearing would take place after jury deliberations. The judge also denied a request to recall Cannon for more testimony, and the case was submitted to the jury. After the jury spoke, the judge had a change of heart. She said she would not hold a *Brady* hearing, noting that the defense must show that the information received was favorable, suppressed, and material in order to amount to a *Brady* violation. *See United States v. White*, 970 F.2d 328, 337 (7th Cir.1992). The judge focused on whether the government suppressed Cannon's file. Evidence cannot be regarded as "suppressed" by the government, the judge correctly reasoned, when a defendant has access to the evidence before trial by the exercise of reasonable diligence. The judge then listed a number of facts documenting the defendants' ability to obtain the information through reasonably diligent investigation: the government had open-file discovery and no defendant took advantage of the policy, the defendants obtained Can-

non's Broward County rap sheet by making a simple document request, and the government "conscientiously" turned over 2,000 pages of discovery material, including the information it collected on Cannon's criminal history.

The defendants now argue that the government purported to turn over comprehensive information on Cannon. Thus, the defendants relied on the good faith of the government. Further, the defendants explain that even if the government did collect information it certainly did not provide this information to the defense. The defendants now request a reversal of their convictions or, at a minimum, a remand for an evidentiary hearing on the *Brady* issue.

The government responds by arguing that defense counsel simply failed in its duty to conduct a reasonably diligent investigation—counsel did not discover the record earlier because they did not bother to look sooner despite their knowledge that Cannon's criminal history, as supplied by the government, seemed confusing and incomplete. The government further points out that a month before trial the government informed the defendants that it had not contacted all local police departments, that the defendants should do so themselves, and that the discovery materials it had were extensive but not exhaustive. The government also argues that the evidence was not material. *See United States v. Payne*, 102 F.3d 289, 293 (7th Cir.1996) ("Evidence is considered material only if there is a reasonable probability that the disclosure of that evidence would have changed the result of the trial."). Finally, the government notes that we will reverse a district court's decision about whether to hold a *Brady* hearing only if we find an abuse of discretion. *United States v. Austin*, 54 F.3d 394, 401 (7th Cir.1995).

■ Judge Williams clearly spotlighted the critical issue—suppression—and she made the right call. The defendants knew before trial that Cannon had an extensive criminal record and that what they had was incomplete and confusing. When they requested the information from Broward County they obtained it without difficulty. As the

judge explained, the government did not suppress the evidence because the defendants could have obtained it before trial through the exercise of reasonable diligence. Thus, the defendants are hoisted by their own petard: without having obtained the Broward County file they would not have a *Brady* argument, but the ease with which they obtained that file defeats their claim.

█ In light of the core purpose of *Brady*, this result makes sense. *Brady* and its progeny do not require the government to conduct an investigation for the defense. *See White*, 970 F.2d at 337. We do not mean to rule out the possibility that there may be cases in which the government violates *Brady* by misleading the defense regarding the availability of otherwise readily obtainable *Brady* material, but this is not such a case.

We also question whether the evidence was material. Because the defendants did impeach Cannon on a number of issues, they can't really make a convincing argument that additional impeachment had a reasonable probability of changing the outcome of the trial. The jury knew Cannon had a lot of warts, and a few more, we think, would not have made any difference. Finally, we question whether some of the material (actually some of the juicy parts) would have even been admissible in evidence. The fact that Cannon may have violated probation by being "charged" with stealing a car or committing a sexual assault—without convictions—is not easily transferred into admissible evidence. *See* Rule 609 of the Federal Rules of Evidence.

We cannot leave this issue, however, without a comment on the government's performance. The assistant U.S. attorney repeatedly assured the court that the government had nothing to clarify Cannon's confusing criminal record. According to the Broward County file, these statements were untrue: the FBI, at least, had additional information on Cannon. The U.S. Attorney's office cannot avoid the sweep of *Brady* by claiming that the right hand did not know what the left hand was doing. *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). At best, this was inadvertent, but that does not make it acceptable. More should be, and is, expected of government prosecutors.

As we have noted, the defendants tried to sully Cannon by showing him to be an unreliable drug user. During his testimony on direct examination Cannon said he used marijuana and cocaine on a regular basis. However, he said he refrained from using drugs during the time the marijuana was under his control. Cannon also said that the only time he used heroin in his life was during a 3–week period following the FBI's attempt to arrest his pal, DeStefano, in the spring of 1994.

The defendants wanted to show that Cannon was deeper into drugs than he admitted on direct. They questioned him about his drug use, and they also wanted to play, for the jury, a taped telephone conversation from August 1994 involving Cannon and Williams recorded by the FBI with her permission. On the tape, Cannon told Williams that he "went out and tried cop," and Williams talked about how DeStefano got them strung out on heroin when he came back into their lives. The defendants argued that the "cop" comment showed that Cannon used heroin during the course of the conspiracy and that Williams' comment reinforces the defendants' view that drug use was going on during the marijuana operation.

Cannon testified on cross that he did not need money to support his heroin addiction, he said he had not discussed selling furniture to buy heroin, he denied asking Williams to buy heroin, and he denied telling Williams he planned to kill himself with an overdose. Williams and Cannon, the defendants say, discuss these matters on the tape.

The judge ruled that the discussion of heroin use on the tape simply did not directly contradict Cannon. She explained that "cop" did not establish that Cannon actually used heroin and that the timing comments did not directly contradict Cannon's story. On the sale of furniture for drug money and the other matters, she correctly explained that

extrinsic evidence may not be used to prove impeachment on a collateral matter. *See United States v. Kozinski,* 16 F.3d 795, 805–06 (7th Cir.1994). The tape, she held, was collateral impeachment at best, and she refused to admit it as extrinsic evidence. She explained that the conversation revolved around "Cannon's postconspiracy need for drug money" and shed "little light" on Cannon's motives for participating in the conspiracy.

The defendants now contend that the tape shows Cannon's motive for fabrication, rather than his motive for participation. They note that proof of motive and reason for fabrication are never collateral. *See United States v. Rodriguez,* 925 F.2d 1049 (7th Cir.1991).

▮ Again, we affirm the decision of the district court. The question of whether the tape revealed perjury lies firmly within the trial court's discretion, as do the questions of independent basis, collateral matter, and extrinsic evidence. The defendants' argument about motive for fabrication as opposed to motive for participation has some small vitality; but the judge hit the nail on the head by explaining that postconspiracy facts are collateral. Cannon's fabrications about his postconspiracy activities hardly establish a motive for fabrication regarding his activities during the conspiracy. The judge properly analyzed each issue and did not abuse her discretion. *See Kozinski,* 16 F.3d at 809. For that reason we will not second-guess the district court's decision to exclude the taped conversation.

▮ None of the defendants testified during the trial, and they claimed that the prosecutor violated *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), by making a number of comments during closing argument that drew attention to their failure to take the stand. A two-step analysis governs our review of a claimed *Griffin* violation: the prosecutor must have made improper remarks and, in light of the entire record, the remarks must have deprived the defendant of a fair trial. *See United States v. Butler,* 71 F.3d 243, 254 (7th Cir.1995).

▮ The challenged comments included: "[the defendants] rely upon the testimony that didn't occur" and "[their case] is based upon no evidence, no testimony." The judge instructed the jury during the prosecutor's closing argument that the defense had no burden of proof, and the judge gave the usual jury instructions at the end of the trial regarding the defendants' refusal to testify.

The government responds that rather than constituting comment on defendants' failure to testify, the prosecutor's remarks were permissible comment on the reasonableness of theories and inferences urged by the defense. *See United States v. Sanchez–Galvez,* 33 F.3d 829, 834–35 (7th Cir.1994). At most, the government concedes, the remarks drew attention to the fact that neither Duncan nor DeStefano (both of whom pled guilty) testified. The government argues that no *Griffin* violation occurs when a prosecutor argues that no evidence exists to support defense theories or when a prosecutor contends that support could have come from witnesses other than nontestifying defendants. *See Butler,* 71 F.3d at 255. Furthermore, a prosecutor may answer and rebut misleading arguments made by the defense. *See United States v. Reed,* 2 F.3d 1441, 1450 (7th Cir.1993).

We have reviewed the challenged remarks and, like Judge Williams, we do not find that they rise to the level of impropriety: they did not refer to the defendants' failure to testify so much as they referred to the plausibility of the defendants' theories. Therefore, no *Griffin* violation occurred.

We now turn to several sentencing issues raised by DeStefano, Weaver, and the government's star, Cannon. We start with DeStefano. Judge Williams enhanced DeStefano's sentence by 2 points under guideline § 2D1.1(b)(2)(B) because he acted as the captain or navigator of the "Yes I Am." DeStefano challenges the enhancement on two grounds. First, he argues that the section does not apply unless a defendant possesses special skills. Second, he claims the enhancement constituted impermissible double counting of his role in the drug importation conspiracy and his sailing of the boat to and from Jamaica.

Section 2D1.1(b)(2)(B) provides for a 2–level enhancement if "the defendant unlawfully imported or exported a controlled substance under circumstances in which ... the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance." In interpreting this language, Judge Williams held that the "Guidelines do not distinguish between a good and a bad captain," thus the section does not require any evidence of special skill.

DeStefano argues that the captain/navigator enhancement requires a showing of "special skill" and that Judge Williams should have applied the definition of that term in the guidelines: " 'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3, comment. (n.2). DeStefano reaches this conclusion by analyzing Application Note 8 to the captain/navigator enhancement:

A defendant who used special skills in the commission of the offense may be subject to an enhancement under § 3B1.3 (Abuse of Position of Trust or Use of Special Skill). Certain professionals often occupy essential positions in drug trafficking schemes. These professionals include doctors, pilots, boat captains, financiers, bankers, attorneys, chemists, accountants, and others whose special skill, trade, profession, or position may be used to significantly facilitate the commission of a drug offense.

Note, however, that if an adjustment from subsection (b)(2)(B) applies, do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill).

In his brief DeStefano explains that "[t]his commentary makes clear that § 2D1.1 identifies boat captains as professionals who possess special skills or position which allow them to facilitate a drug trafficking scheme. Thus the § (2)(B) enhancement would not include individuals who are not imbued with these special skills or position." DeStefano supports this conclusion through several lines of argument.

His strongest argument is that Application Note 8 bars the use of both sections because they cover identical conduct—the use of special skills. He explains that this court allows cumulative application of enhancements unless the guidelines expressly provide otherwise or another compelling basis exists for implying such a prohibition. See United States v. Harris, 41 F.3d 1121, 1123 (7th Cir.1994). He also notes that this court bars double counting where two or more upward adjustments are premised on the same conduct. See United States v. Haines, 32 F.3d 290, 293 (7th Cir.1994). He combines these two principles to reach his conclusion: The guidelines expressly prohibit the application of both the captain/navigator enhancement and the use of special skill enhancement because the conduct triggering the first is identical to the conduct triggering the second.

The strongest counterargument is that, if DeStefano is correct, two separate enhancements would make no sense. The use of special skill enhancement also provides a 2–point increase, and it applies to a much broader array of offenses than the captain/navigator enhancement. If we interpret the two sections both to require proof of a special skill, then we defy one of the basic canons of statutory interpretation by rendering the captain/navigator enhancement mere surplusage. See, e.g., United States v. Burrell, 963 F.2d 976, 992 (7th Cir.1992).

DeStefano's second argument is that identical words have the same meaning. Since both sections refer to "pilot" and since Application Note 8 states that § 3B1.3 covers "boat captains," then we should give these terms the same meaning in both sections. In contrast, we could take a plain language approach to interpreting the captain/navigator enhancement. See United States v. Joelson, 7 F.3d 174, 180 (9th Cir.1993); see also United States v. Guerrero, 114 F.3d 332, 346 (1st Cir.1997) (finding meaning of "pilot" by reference to Webster's), petitions for cert. filed (June 27, 1997) (Nos. 97–5006, 97–5874). Giving the words in the section their plain meaning would allow us much greater freedom and would not necessarily compel the

conclusion that captain or navigator required special skill.

Next, DeStefano argues that if we do accept that the captain/navigator enhancement requires special skill, then we cannot find those skills based on the actual events. In other words, we cannot interpret the section to allow proof of special skill based on the fact that DeStefano, or any other average person, accomplished the task in question—we need proof of special training or licensure. *See United States v. Lewis,* 41 F.3d 1209, 1214 (7th Cir.1994). *But cf. United States v. Gandy,* 36 F.3d 912, 914 (10th Cir.1994) ("a defendant's special skill may be derived from experience or from self-teaching").

After the parties filed their briefs, the First Circuit handed down the only decision directly on point: *United States v. Guerrero,* 114 F.3d 332 (1st Cir.1997), *cert. denied,* ——— U.S. ———, 118 S.Ct. 320, 139 L.Ed.2d 248 (1997). The *Guerrero* court upheld the enhancement of Manuel Rivas' sentence under § 2D1.1(b)(2)(B) for his acts as the "pilot" of a ship carrying drugs. The facts of that case are that Rivas, who possessed no special navigational rank or skills, "had been hired by a man looking for 'any seaman who was available to navigate.' When the ship set sail, he complied with Pilco's instruction to 'take care of the helm,' which Rivas manned for a four hour shift.... *'I was told I was in charge of the helm, which was my profession.' " Id.* at 346 n. 15 (emphasis added by First Circuit). The First Circuit employed a plain meaning analysis and reasoned that:

> The sentencing guideline does not define the word "pilot," and our research has not revealed any caselaw to inform our inquiry. Nevertheless, the common dictionary definition of "pilot" includes a person hired to steer a vessel. *See, e.g.,* Webster's Third New International Dictionary of the English Language 1716 (1986) (defining "pilot," *inter alia,* as "one employed to steer a ship: helmsman"). While the act of steering a forty-foot vessel on the high seas may or may not involve a skill obtained through extensive maritime training, we cannot say that the district court committed plain error in finding that Rivas

"acted as a pilot" aboard the boat within the meaning of U.S.S.G. § 2D1.1(b)(2)(B). *Id.* at 346.

■ The question of whether the captain/navigator enhancement requires special skill is an issue of first impression for this circuit. Since this question involves the interpretation of terms used in the guidelines, we review *de novo. See United States v. Boyle,* 10 F.3d 485, 489 (7th Cir.1993). The interpretation of the section is, we think, a closer question than the First Circuit suggests.

DeStefano's arguments are not unpersuasive, but he faces a nearly insurmountable barrier in attempting to overcome the mere surplusage canon. If both sections require special skill, then the captain/navigator enhancement would add nothing to the guidelines—this interpretation would defy logic. DeStefano also claims that the prohibition on cumulative application militates in favor of reading the captain/navigator section and the use of special skill section in parallel. To the contrary, the prohibition on cumulative application may appear because while § 2D1.1(b)(2)(B) applies to a narrow category of offense (narcotics), it applies to a wider class of activity (no special skill required). Thus, the sections are not entirely congruent and the guidelines bar cumulative application only where the two sections overlap.

Finally, DeStefano explains that we must interpret the two sections in parallel because they cover identical conduct and employ identical words. The list of specialties in § 2D1.1(b)(2)(B) refers to discrete professions. The use of special skill section tells us that enhancements based on the use of professional skill require more proof than evidence of conduct. On the other hand, § 2D1.1(b)(2)(B) applies to defendants who merely "acted as" captains and navigators, not just to those defendants who are captains and navigators. The use of "acted as" suggests that we should look at conduct and not just at training or licensure. In the end, therefore, the plain language of the statute carries the day. Because the section states that it applies whenever the defendant "acted as" a captain or navigator, we do not read

§ 2D1.1(b)(2)(B) to require proof of special skill.

■ DeStefano definitely acted as the captain of the "Yes I Am." He told Cannon that he would "captain the trip," he listed himself as the captain on Customs documents, and he directed the operation of the vessel. It's true that DeStefano was no Magellan, but whether he was a poor captain or an excellent one is irrelevant. The district judge properly interpreted the captain/navigator enhancement as requiring no special skill and correctly applied that interpretation to the facts.

■ DeStefano does not stop with a statutory interpretation challenge to the enhancement. He also argues that because his base offense level took into account his conduct of importing marijuana by boat, the use of the captain/navigator enhancement based on the same conduct constituted impermissible double counting. He explains that it constitutes double counting to apply an aggravating factor already taken into account in the base offense level. *See United States v. Lallemand*, 989 F.2d 936, 939 (7th Cir.1993). He also explains that enhancements are inappropriate when the base offense level takes into account the typical features of an offense. *See id.*

DeStefano misperceives the application of the bar on double counting. The bar on double counting comes into play only if the offense itself *necessarily* includes the same conduct as the enhancement. *See, e.g.,* U.S.S.G. § 3B1.3 (barring the application of the enhancement for abuse of trust/use of special skill "if an abuse of trust or skill is included in the base offense level or specific offense characteristic"). In DeStefano's case, the offense of importation covers a multitude of methods used by smugglers to bring drugs to the United States—it does not necessarily include the conduct of captaining a boat. If the court had sentenced DeStefano for the nonexistent crime of conspiracy to import marijuana by boat, then perhaps the prohibition on double counting might come into play. This challenge to the captain/navigator enhancement was properly rejected by the district judge.

■ DeStefano pled guilty on June 19, 1995—3 days before the scheduled start of the trial. He had entered plea negotiations earlier but could not convince the government to accept his contention that the conspirators brought back less marijuana than previously reported. He states that he did not receive a satisfactory offer to cop out until just before the trial began. As part of the plea agreement, the government acknowledged that "by pleading guilty the defendant has permitted the government to reduce substantially the length of this case." When he was sentenced, DeStefano received a 2–point reduction for acceptance of responsibility, but despite the sentencing court's statement that the guilty plea "cut in half what was predicted to be a long trial," the judge denied a further 1–point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(b)(2). DeStefano claims that the sentencing court improperly focused on the chronological or temporal timeliness of the plea rather than on its effect on the expenditure of resources by the government and the court. *See United States v. Wetwattana*, 94 F.3d 280, 285–86 (7th Cir.1996).

In her written decision Judge Williams stated that she denied the extra reduction because DeStefano's plea came at the eleventh hour and, thus, was not "timely." We agree. DeStefano could have challenged the weight of the marijuana at sentencing. Any dispute over the weight should not have delayed his guilty plea.

■ In its brief the government properly explains that the effect on the length of the trial is not dispositive when compared to the amount of pretrial preparation. *See* U.S.S.G. § 3E1.1(b)(2), comment. (n.6) (explaining that defendant must notify authorities of intent to plead early enough for the government to avoid preparing for trial and for the court to schedule its calendar effectively). The government also notes that the court's decision regarding acceptance of responsibility deserves great deference on review. *See United States v. Francis*, 39 F.3d 803, 807 (7th Cir.1994) (review for clear error).

Judge Williams did not explicitly address the question of resources in determining

DeStefano's eligibility for the 1–point deduction, but we will not disturb her exercise of discretion simply because DeStefano's plea shortened the trial. The reference to an eleventh-hour plea sufficiently conveys the court's findings and does not imply that she flouted the rule announced in *Wetwattana*.

■ Weaver, the master telemarketer, raises several sentencing objections. Recall that during Weaver's participation in the scam the operation netted $360,000. Weaver alone defrauded victims of $282,000—78 percent of the total take during his involvement. Nevertheless, Weaver argues that the court should not have added 9 points to his offense level based on the $360,000 figure. Instead, he contends, the court should have added only 8 points based on the amount of loss directly attributable to his calls.

■ Weaver's argument on this point is meritless. Weaver contributed over three-quarters of the take, he developed the most successful scam, other members of the telemarketing operation used his rap, and, most importantly, Weaver knew from the beginning that the scheme had other participants. As Judge Williams explained, a defendant is responsible for reasonably foreseeable losses caused by coconspirators. *See United States v. Catalfo*, 64 F.3d 1070, 1082 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1683, 134 L.Ed.2d 784 (1996); U.S.S.G. § 1B1.3(a)(1)(B).

Weaver next contends that we should base our decision on *United States v. Studley*, 47 F.3d 569 (2d Cir.1995), in which the court held that the defendant in a telemarketing scheme did not participate in a joint criminal activity. The government effectively distinguished *Studley*, however, on the grounds that Weaver was far more deeply involved than Studley (who initially believed himself to be taking part in an honest business). In addition, in a different factual setting, we have held that a sentencing court could find a joint undertaking without proof of all the factors set out in *Studley*. *See United States v. Boatner*, 99 F.3d 831, 835–36 (7th Cir. 1996). Furthermore Weaver clearly matches the description of a defendant involved in joint fraudulent activity as described in Application Note 2(c)(2) to guideline § 1B1.3.

■ While we review *de novo* questions regarding the definition of loss and the method of calculation of loss, *see United States v. Jackson*, 95 F.3d 500, 505 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 717, 136 L.Ed.2d 636 (1997), we do not find any flaw in the district court's addition of nine points to Weaver's offense level. Because of Weaver's knowledge of the other participants and his critical role in the success of the overall operation, it seems beyond cavil that the sentencing court properly held Weaver responsible for the other $77,000 obtained by his telemarketing coconspirators.

Weaver fudged—actually lied—on some details of his involvement in the crimes when he testified before the grand jury. He told the grand jury that he agreed to accept marijuana as payment for his earnings in the telemarketing scheme, but he said that he had Cannon remove the marijuana from the trunk of his car. Cannon testified at trial that he did not remove the marijuana. Weaver's girl friend testified to Weaver's version of events. At sentencing, the court found Cannon credible on everything, including this point. The jury, meanwhile, found Weaver guilty on the marijuana distribution conspiracy, but it found him not guilty of the importation conspiracy.

■ Based on the conflict between Cannon's trial testimony and Weaver's grand jury testimony, Judge Williams added 2 points to Weaver's offense level for obstructing justice. *See* U.S.S.G. § 3C1.1. The judge analyzed this issue under *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), which lays out the test for the application of the obstruction of justice enhancement: the sentencing court must find that the defendant gave "false testimony concerning a *material* matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Id.* at 94, 113 S.Ct. at 1116 (emphasis added). We have stated that a matter is material if it is "crucial to the question of ... guilt...." *United States v. Mustread*, 42 F.3d 1097, 1106 (7th Cir.1994); *see* U.S.S.G. § 3C1.1, comment. (n.5). Judge Williams reasoned that Weaver's statement was material because it could have led the

jury to believe that he would not sell the marijuana in order to recover his money. The testimony, thus, was crucial to the question of Weaver's guilt on the charge of conspiracy to distribute marijuana.

Weaver argues that he had already admitted his guilt to the grand jury regarding his agreement to accept the marijuana and, therefore, the question of whether he returned the marijuana or kept it is irrelevant to the charge of conspiracy. Weaver points out that the prosecution made exactly this argument at closing. Weaver analogizes his case to *United States v. Parker*, 25 F.3d 442, 448–49 (7th Cir.1994), in which this court ruled that a defendant's false statement that he stole $200 from a bank (the actual amount equaled $1,252) did not merit an obstruction of justice enhancement because the statement was irrelevant to his guilt and the amount was not an element of the crime.

Weaver's arguments have merit. The government charged him with conspiracy to distribute, not with the substantive offense of distribution. He admitted his agreement to accept marijuana instead of cash and, thus, he admitted his intent to sell marijuana in order to make up for the money Duncan owed him. In other words, Weaver admitted to the elements of the offense. To put a finer point on it, even if Weaver had never received the marijuana, a jury still could have found him guilty of conspiracy to distribute.

We think Weaver's situation is close to that of the defendant in *Parker.* It does not matter whether Weaver's trunk contained 100 pounds, or 40 pounds, or no marijuana. It does not matter whether Weaver drove off with the marijuana and sold it, whether he drove off with it and gave it away, or whether he drove off without it. By agreeing to accept the marijuana in lieu of cash, he admitted his involvement in the conspiracy to distribute marijuana. The only difference between this case and *Parker* is that Parker committed a substantive offense while Weaver committed an inchoate offense. Because both defendants admitted to all the elements, their prevarications on the details cannot be considered *crucial* to the question of guilt. Thus, the application of the obstruction of justice enhancement to Weaver constituted clear error. *See United States v.*

*Francis,* 39 F.3d 803, 811 (7th Cir.1994) (holding that we review the application of § 3C1.1 enhancements for clear error). Finally, after all these pages, the defendants get a small win. In addition, Weaver must be resentenced on count 17 because the sentence imposed—71 months—exceeds the statutory maximum of 5 years.

Lastly, Cannon advances several weak arguments for disturbing the $10,000 fine he received on top of his 28–month sentence. The fine—within the guideline range of $7,500 to $75,000—drew no objection and was supported by Judge Williams' adoption of facts in the presentence report. We will not disturb it based on the soft arguments Cannon sets out in his brief.

For these reasons, the convictions of Weaver, Senn, and Marino are AFFIRMED. The sentences of DeStefano and Cannon are AFFIRMED. Weaver's sentence is VACATED and his case REMANDED to the district court for resentencing.