**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Peter S. DIMAS and Ramon Roman,**
**Defendants–Appellants.**

Nos. 92–2975, 92–2976, 93–1688 and 93–1884.

United States Court of Appeals,
Seventh Circuit.

Argued July 8, 1993.

Decided Aug. 18, 1993.

Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Robert Christopher Cook (argued), Office of the U.S. Atty., Chicago, IL, for U.S.

Marvin Bloom (argued), James LaVecchia, Chicago, IL, for Peter S. Dimas.

James LaVecchia, Bruce Cowan (argued), Chicago, IL, for Ramon Roman.

Before CUDAHY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

PER CURIAM.

A jury convicted the defendants of various drug offenses. These consolidated appeals challenge those convictions on three grounds. Two of the grounds lack merit. However, the record is insufficient for us. to review the third, which concerns the denial of a motion for a new trial, so we vacate that ruling and remand for an evidentiary hearing limited to that issue.

I.

On April 23, 1991, Peter Dimas and Ramon Roman were caught selling a kilogram of cocaine to an undercover DEA agent. They were indicted on charges of conspiracy, possession with intent to distribute, and distribution of a controlled substance, all within 1000 feet of an elementary school. 21 U.S.C. §§ 841(a)(1), 846, 860 and 18 U.S.C. § 2. Dimas was also charged with distributing a smaller amount of cocaine to the same agent a month earlier. A joint trial was scheduled and both defendants moved for a severance, arguing that their defenses were mutually antagonistic. Dimas's defense was entrapment, while Roman claimed to have been an innocent dupe who did not understand what was going on. The court denied the motions and the jury convicted on all counts.

These consolidated appeals raise three issues: (1) Should the district court have granted the defendants' motion for a new trial based on evidence withheld by the prosecution? (2) Should the district court have severed the cases and ordered separate trials? and (3) Is the government required to prove, and if so did it fail to prove, that Dimas had the intent to be within 1000 feet of a school when committing the offenses? Though we find no error on the last two points, we vacate the district court's denial of the motion for a new trial and remand for an evidentiary hearing.

II.

A. *Failure to Disclose Evidence*

Several months after their convictions Dimas and Roman both requested a new trial based on the government's failure to disclose certain evidence concerning DEA agent Wysocki, its primary witness. This evidence, they assert, was known to the prosecutors before trial and might have led to an acquittal, so they are entitled to a new trial under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The evidence in question pertains to an Assistant United States Attorney's (AUSA) allegation that agent Wysocki falsified a DEA report in an earlier case, *United States v. Afutu.* Specifically, the AUSA believed that Wysocki had back-dated a DEA report and included information he did not learn until later in order to justify the receipt of a heroin sample from a confidential informant. The DEA prohibits agents from receiving drug samples until a specific case has been initiated regarding such transactions, and the AUSA thought Wysocki had accepted a sample before that time and back-dated a report to cover it up. There was also concern that Wysocki's description of the sting of Afutu to the AUSA differed from his grand jury testimony. Wysocki denied any misconduct and stated that all of his actions were in line with DEA policy.

As a result of the allegation the indictment in *Afutu* was voluntarily dismissed pending further review. Supervising U.S. Attorneys met with Wysocki's DEA supervisors to discuss the situation and decided to refer the matter to the Office of Professional Responsibility at either the Department of Justice or the DEA. At the time of trial the investigation was still pending.

To prevail on a *Brady* claim and win a new trial, the defendants must show that the evidence was favorable to them, was suppressed by the prosecution, and was material to the case. *United States v. White,* 970 F.2d 328, 337 (7th Cir.1992). The evidence here was not disclosed by the prosecution and was arguably favorable to the defendants, so the main question is whether it was

material. Evidence is material under *Brady* if, had it been disclosed, there is a reasonable probability that the outcome of the trial would have been different. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987); *United States v. Bagley*, 473 U.S. 667, 678, 685, 105 S.Ct. 3375, 3381, 3385, 87 L.Ed.2d 481 (1985). A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Ritchie*, 480 U.S. at 57, 107 S.Ct. at 1001; *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. Evidence bearing on a witness's credibility can be material when it has significant impeachment value. *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380; *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Dimas and Roman assert that the evidence was material because if they had known of it at the time the trial might have ended differently. They believe that they could have used that information to attack agent Wysocki's credibility, and since Wysocki was the government's key witness impeaching him could have swayed the jury to acquit. Further, Dimas contends that he could have used it to support his entrapment defense; the allegation concerned irregularities in Wysocki's dealings with a confidential informant, and Dimas was arguing that the informant in his case had unduly enticed him to commit a crime. Thus the defendants conclude that the government deprived them of a fair trial by not disclosing crucial information.

The government argues that the evidence here was not material because it would not have been admissible at trial. "Information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992); *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir.1989); *United States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir.1983); *United States v. Wigoda*, 521 F.2d 1221 (7th Cir.1975). It maintains that the evidence

would have been excluded under Federal Rules of Evidence 404(b) and 608(b), and therefore could not have affected the trial's result. The district court agreed with the government, denying the defendants' motion for a new trial without holding a hearing. It found that the evidence would be irrelevant for any substantive purpose other than to show that Wysocki had a propensity for falsifying reports, and thus was inadmissible under Rule 404(b). Also, even if the evidence could be admitted for impeachment on cross-examination under Rule 608(b), Wysocki would have denied the allegation, and the defendants could not have contradicted his answer with extrinsic evidence. *United States v. Abel*, 469 U.S. 45, 55, 105 S.Ct. 465, 470, 83 L.Ed.2d 450 (1984). And even if extrinsic evidence had been allowed, the court found that there was still ample proof to convict, so any such evidence would not have changed the result.

Though we recognize the experienced district judge's familiarity with all aspects of this case, the somewhat sparse record leaves us with serious questions about what impact the *Brady* material might have had on the jury. Because of these lingering doubts we feel compelled to vacate the order denying a new trial and remand for the limited purpose of allowing the district court to hold an evidentiary hearing on this issue. *Cf. Barkauskas v. Lane*, 878 F.2d 1031, 1034 (7th Cir. 1989) (remanding for evidentiary hearing where record was inadequate to decide *Brady* issue). While the court may direct the hearing toward any matters it deems relevant, it should make a concerted effort to address the questions set forth below. After the hearing the court should make written findings and conclusions and enter its ruling on the motion for new trial.

■ A preliminary question for the court to consider is whether the evidence here was actually suppressed by the prosecution. Though the prosecutors admit that they did not disclose it, and do not argue that they did not know of it before trial,[1] there is still the

---

1. The accusing AUSA and his superiors certainly knew of the accusation before trial, and they were part of the same office as the prosecutors

here. Knowledge of *Brady* material may be imputed between prosecutors in the same office. *See Giglio*, 405 U.S. at 154, 92 S.Ct. at 766;

question whether the defendants might have obtained the evidence themselves with reasonable diligence. If they could, then the evidence was not "suppressed" under *Brady* and they would have no claim. *White,* 970 F.2d at 337. On the other hand, it may be that they could not have obtained the information or discovered its existence, in which case the fact that the government did not disclose it is enough. *See United States v. Douglas,* 874 F.2d 1145, 1162 n. 30 (7th Cir. 1989) (the good or bad faith of the government in not disclosing evidence is irrelevant; it is the character of the evidence that matters, not the character of the prosecutor).

Next, and most important, the court must determine whether and to what extent evidence of the accusation itself or evidence relating to the accusation would be admissible at trial. In other words, the court must decide what evidence would technically be admissible and what portion of that evidence it would allow in under the discretion granted it by Rule 608(b).[2] The logical starting point would be to find out what questions the defendants would ask of Wysocki and decide how far the court would let that line of questioning go. For example, could the examining attorney only ask whether an allegation had been made, or could he also inquire into the nature of the allegation, who made it and when, and the current status and details of any investigation? After deciding how it would limit the cross-examination, the court should address how the prosecution would have rehabilitated Wysocki, what tactics it would have let prosecutors use to do so, and how successful the rehabilitation would have been.

Another inquiry would be whether the proposed evidence bears on Wysocki's character for truthfulness or untruthfulness, as required by Rule 608(b), or whether it merely

indicates that he may have done a poor job following DEA policies. If the evidence is probative of veracity, the court should also consider how it reflects on his specific conduct in this case. *See* 1 McCormick on Evidence 139 (4th ed. 1992) (one factor guiding discretion under Rule 608(b) is "the relevancy of the act of misconduct to truthfulness").

After deciding what evidence would have been admissible under the Rules and how it would have exercised its discretion concerning that evidence, the court must answer the central question under *Brady:* Is there a reasonable probability that the suppressed evidence would have affected the result? For starters, the court should contemplate the likely net impact of the evidence on Wysocki's credibility. How would the fact that the evidence is merely of an allegation, and an allegation Wysocki denies, affect the jury?[3] Also, to what extent would the prosecution have been able to rehabilitate Wysocki and take the sting out of the *Brady* material?

In addition, the court should analyze separately the impact of any admissible evidence on each defendant's case. Dimas used an entrapment defense, charging that the confidential informant enticed him with promises of a sexual relationship if he agreed to sell drugs to Wysocki. How would the *Brady* evidence have supported this defense? How does that evidence reflect on Wysocki's conduct with informants? How would that evidence enhance other evidence that the informant contacted Dimas a few times without Wysocki recording the conversation or instructing her as to proper procedures? Roman, in contrast, used an innocent bystander defense. How would that defense have been helped by impeaching Wysocki, who had no contact with Roman before the arrest? If the evidence would help Dimas's entrapment

---

*United States ex rel. Smith v. Fairman,* 769 F.2d 386, 391–92 (7th Cir.1985).

**2.** We agree with the district court that the *Brady* evidence would be kept out under Rule 404(b). The evidence does not fall within any of the exceptions to that Rule, and its only relevance would be to show Wysocki's propensity for misconduct. Thus we think that the evidentiary hearing should focus on the admissibility of any evidence under Rule 608(b).

**3.** It is important that the court limit its analysis to the effect of the allegation alone; later developments in the investigation, if any, are irrelevant because the question is whether the result would have changed if the prosecutors disclosed the evidence at the time, not whether the outcome would differ if the case were tried today.

1020

defense, how would that affect Roman's conviction for conspiring with Dimas?

Another factor the court ought to look into is whether the prosecution acted in bad faith. Though bad faith alone is not enough to require a new trial, it could shed some light on whether the prosecution thought the evidence was valuable to the defendants.

Finally, the court should make clear what evidence besides Wysocki's testimony supported the conviction, and whether that evidence would prevail even if some *Brady* evidence was admitted. In other words, was the prosecution's case so strong that the jury would have convicted even if Wysocki's credibility was questioned?

When these and any other questions have been answered the district court should issue written findings and conclusions and enter its ruling on the defendants' motion for a new trial. Either defendant may of course appeal from that ruling, but the appeal would be limited to the new trial issue alone since, as discussed below, we affirm the convictions in all other respects.

### B. *Severance of Trials*

#### 1. Roman

■ Roman argues that the district court should have severed the case for two reasons. First, he contends that his defense and Dimas's defense were mutually antagonistic. Second, he asserts that Dimas conducted his defense in such a way as to prejudice him and deny him any chance of a fair trial.

■ Defenses are said to be mutually antagonistic when the acceptance of one defense precludes any chance of acquittal for the other defendant. *United States v. Cochran*, 955 F.2d 1116, 1121 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992). The fact that defenses are mutually antagonistic does not mandate severance, however, as "[m]utually antagonistic defenses are not prejudicial *per se.*" *Zafiro v. United States*, — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). A severance is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a

reliable judgment about guilt or innocence." *Id.* We review the denial of a severance motion for an abuse of discretion. *United States v. Goines*, 988 F.2d 750, 781 (7th Cir. 1993).

To support his claim that the antagonistic defenses here denied him a fair trial, Roman quotes portions of the transcript where he and Dimas each say that it was the other man who obtained the drugs. Roman Br. at 11–12. While this may show a discrepancy between their stories on one point, such a difference does not make their defenses mutually antagonistic. Dimas's defense theory was not "Roman did it, I was an innocent bystander"; it was entrapment—"I did it, but it wasn't my idea." Roman was the only one claiming to be an innocent bystander, and defenses of entrapment and non-involvement are not mutually antagonistic; the jury could consistently believe one, both, or neither of the defenses, and acceptance of one did not spell doom for the other defendant. *Cochran*, 955 F.2d at 1121; *United States v. Guerrero*, 938 F.2d 725, 728 (7th Cir.1991). Since the defenses were not antagonistic, Roman has no hope of showing that they were so prejudicial as to require severance, and the district court did not err in denying his request.

■ Roman's second argument is that even if the defenses were not antagonistic, Dimas conducted his defense in such a way as to prejudice him and deny him a fair trial. While a codefendant's defense tactics might in rare cases unduly prejudice a defendant, *see United States v. Ziperstein*, 601 F.2d 281, 286 (7th Cir.1979) (en banc) (recognizing the possibility that a defendant "could have been prejudiced by the actual conduct of a codefendant's defense."); *United States v. Johnson*, 478 F.2d 1129 (5th Cir.1973), that did not occur here. First of all, Roman does not explain how Dimas hurt him, stating only that "Dimas took every opportunity to incriminate Roman" and that the court recognized that the attorney for each defendant was attacking the other defendant. Without some examples of prejudicial conduct, it is impossible to conclude that the joint trial "compromise[d] a specific trial right of one of

the defendants, or prevent[ed] the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* — U.S. —, —, 113 S.Ct. 933, 938 (1993). A claim that a codefendant's conduct required severance "depends on a careful evaluation of the facts elicited, prejudicial tendencies, and the entire course of the trial prior to the challenged conduct," *Ziperstein,* 601 F.2d at 286, but that does not mean that the appellate court must comb the record and speculate as to what conduct was prejudicial. Moreover, the mere fact that each defendant points the finger at the other and attacks the other causes no prejudice because neither is at an undue disadvantage. As this court observed in *United States v. Zafiro,* 945 F.2d 881, 886 (7th Cir.1991), *aff'd, Zafiro v. United States,* — U.S. —, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993):

> Each [defendant] was accusing the other of being the drug dealer. In this symmetrical situation, each defendant had to defend himself against the prosecutor and one other defendant but at the same time had a live body to offer the jury in lieu of himself.... No defendant was placed at a *net* disadvantage by being paired with another defendant whom he could accuse and who could accuse him in turn, let alone so disadvantaged as to be unable to obtain a fair trial.

Thus, the conduct Roman complains of is nothing more than the usual blame-shifting that occurs in many joint trials, and that is not enough to declare the trial unfair. *Guerrero,* 938 F.2d at 729.

Roman's other claim of prejudice is that he could not present an effective defense because he could not cross-examine Dimas without eliciting damaging statements. Apparently the theory is that when Dimas took the stand to present his entrapment defense, Roman would want to cross-examine him and bring out incriminating post-arrest statements Dimas had made to police. Portions of those statements implicated Roman, however, so he feared that any attempt to cross-examine Dimas would end up undermining his case when the full statements came out. Thus he was in a catch–22; he needed to examine Dimas to support his defense that

Dimas was the wrongdoer, but if he did so he would end up hurting himself. The problem with this argument is that the portions of Dimas's statements implicating Roman had been suppressed in a pre-trial order under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and the judge told Roman that the statements would not come in even if Dimas testified. Moreover, even if Roman's cross-examination of Dimas somehow opened the door to the damaging statements, Roman would not have been denied any trial right. The statements at issue were suppressed because under *Bruton,* statements of one defendant inculpating a codefendant are excluded in order to protect the codefendant's right of confrontation. *Id.* at 128, 88 S.Ct. at 1623. Here, however, there would have been no confrontation problem because Dimas took the stand and Roman could cross-examine him on anything he said. Since Roman was able to cross-examine Dimas he was not deprived of any trial right, and thus no severance was necessary. *Zafiro v. United States,* — U.S. —, 113 S.Ct. at 938; *Nelson v. O'Neil,* 402 U.S. 622, 627, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971) ("The Constitution as construed in *Bruton,* in other words, is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination.").

■ Roman also complains that his defense was impeded by the government's examination of Dimas. During that examination Roman had to choose between objecting to certain questions (to prevent answers that might hurt him) and letting Dimas be discredited (which might make Roman look better). This "dilemma" did not deny Roman a fair trial; every attorney must make choices about when to object and when to remain silent as a part of trial strategy. That the witness was a codefendant makes no difference. *Zafiro v. United States,* — U.S. at —, 113 S.Ct. at 938.

#### 2. Dimas

Dimas also claims that the cases should have been severed, arguing that Roman's lawyer's conduct deprived him of a fair trial.

This claim must be rejected for the same reasons as Roman's claim. Yes, Roman's lawyer did try to paint an unflattering portrait of Dimas, doing his best to make it look like Dimas was an experienced drug-peddler, but that was simply part of his defense. Roman had to make Dimas look bad for the jury to believe that he was an innocent dupe, caught in the wrong place at the wrong time. Once again, any minor prejudice to Dimas was a natural consequence of a joint trial, and it was for the jury to decide whether Roman's attorney was correct. *United States v. Zafiro*, 945 F.2d at 886; *Guerrero*, 938 F.2d at 729. Though Roman's attorney may have made Dimas's defense slightly more difficult, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro v. United States*, — U.S. at —, 113 S.Ct. at 938.

### C. Intent and the "Schoolyard Statute"

■■■ Dimas next contends that the government failed to prove that he violated 21 U.S.C. § 860(a). That statute enhances the penalty for anyone convicted of "distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary [school]." There is no dispute that Dimas was within one thousand feet of the property at Clinton Elementary when he distributed the cocaine; the actual distance was nineteen feet, two inches. Dimas maintains, however, that the statute requires proof that he knew he was within one thousand feet of the elementary school when the transaction occurred. In response, the government contends that § 860(a) is a strict liability statute, so that the mere fact that Dimas actually was within one thousand feet of the school is enough to convict, regardless of whether he knew he was near a school.

The Second Circuit addressed this issue eight years ago in *United States v. Falu*, 776 F.2d 46 (2d Cir.1985). The *Falu* court held that § 845a (the precursor to § 860(a)) did not have a knowledge requirement for two reasons. First, the legislative history showed that "Congress sought to create a drug-free zone around schools" and "a requirement that the dealer know that a sale is geographically within the prohibited area would undercut this unambiguous legislative design." *Id.* at 50. Second, this construction of the statute did not criminalize otherwise innocent activity, because the statute requires a violation of 21 U.S.C. § 841(a)(1) (or, in its modern version, a violation of 21 U.S.C. § 856), which already contains a knowledge requirement. Anyone convicted of distributing, manufacturing, or possessing narcotics with intent to distribute knew what he was doing, and the statute merely enhances the penalty for crimes occurring in a certain location. "In this respect, the schoolyard statute resembles other federal criminal laws, which provide enhanced penalties ... upon proof of a fact of which the defendant need not be aware." *Id.* Thus the burden is on dealers to find where the schools are and steer clear of them.

*Falu* has been reaffirmed in later decisions, *United States v. Holland*, 810 F.2d 1215, 1223–24 (2d Cir.1987); *United States v. Ofarril*, 779 F.2d 791, 792 (2d Cir.1985), and four other circuits have adopted its reading of § 860(a). *United States v. Pitts*, 908 F.2d 458, 461 (9th Cir.1990); *United States v. Cross*, 900 F.2d 66, 69 (6th Cir.1990); *United States v. Lewin*, 900 F.2d 145, 148 (8th Cir. 1990); *United States v. Holland*, 810 F.2d 1215, 1222–24 (D.C.Cir.1987). No circuit has gone the other way. The reasoning in *Falu* and later decisions is persuasive, and we join them in holding that § 860(a) has no knowledge requirement.

### III.

We find no error in the district court's decision not to sever the trial and in the convictions under 21 U.S.C. § 860(a) without proof of knowledge. Nevertheless we have concerns about the government's failure to disclose evidence bearing on agent Wysocki's testimony, and therefore remand for the limited purpose of conducting an evidentiary hearing on the defendants' motion for a new trial under *Brady v. Maryland*. At that hearing the district court should attempt to find answers to the questions listed above and any questions of its own bearing on

admissibility of the evidence and the effect it might have had on the trial.

Accordingly, we affirm the convictions of 'both defendants except for the ruling on their motion for a new trial, which we vacate and remand for an evidentiary hearing consistent with this opinion.