In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2234

United States of America,

Plaintiff-Appellee,

v.

Michael Grintjes,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99-CR-143--Charles N. Clevert, Judge.

Argued October 23, 2000--Decided January 22, 2001

Before Posner, Diane P. Wood, and Williams, Circuit
Judges.

Diane P. Wood, Circuit Judge. Michael Grintjes, a
mortgage broker, became involved in a scheme
concocted by one of his clients, Thomas Younk. It
was a variant of the kind of property flipping
practice we discussed recently in United States
v. Haehle, 227 F.3d 857, 858 (7th Cir. 2000).
Younk's plan was to obtain inflated appraisals of
properties, use the inflated appraisals to obtain
mortgages, purchase the properties for
significantly less than the amount of the
mortgage, and pocket the rest of the loan.
Grintjes's involvement in Younk's scheme led to
his indictment on one count of aiding and
abetting a fraudulent scheme involving the
interstate transfer of funds, in violation of 18
U.S.C. sec.sec. 2 and 2314. Grintjes testified in
his own defense at trial, and the government
decided to respond with several rebuttal
witnesses. Grintjes objected on the grounds that
the government's proposed evidence was
inappropriate for rebuttal and that its
introduction at that stage of the trial violated
his right, under Brady v. Maryland, 373 U.S. 83
(1963), to have the government disclose
potentially exculpatory evidence in time for him
to make use of it. The district court admitted
the testimony over his objection, and the jury
convicted Grintjes. Grintjes now renews his

challenges to the rebuttal evidence. Because we find that the district court did not abuse its discretion in admitting the evidence, we affirm the conviction.

I

Grintjes began brokering mortgage transactions for Younk in October 1997. Between that date and February 1998, he handled eight loans for Younk, all involving Younk's purchase of properties in northeast Wisconsin. In each of these transactions, Younk sent Grintjes an offer to purchase and an appraisal of the property prepared by Charlene Nasgovitz, an appraiser working in Younk's real estate office. Grintjes would then collect other necessary paperwork, including verifications from Younk's banks that he had the money for the down payment available in his accounts, and would present the package to one or more lenders for approval. Grintjes testified that he never independently inspected the properties Younk sought to finance, nor did he ever verify the appraisals. He opined, however, that it was not common in the industry for a mortgage broker to do so.

On January 15, 1998, Grintjes presented one of Younk's loan applications to USA Funding. The property Younk wanted to buy had been appraised by Younk's office at $352,000; Younk stated that he planned to purchase the property for $350,000 and was seeking a loan of $262,500. Unfortunately for Younk and Grintjes, however, the president of USA Funding, Michael Walters, was familiar with the property Younk described and became suspicious about the appraisal. According to Walters, the property was a small house in Coleman, Wisconsin, and it could not have been worth $350,000. USA Funding ordered a review appraisal and discovered that the initial appraisal was fraudulent. After making this discovery, on January 15, Walters spoke with Grintjes about the loan application and explicitly told him that the appraisal Younk had supplied was fraudulent. In spite of that intelligence, on the next day Grintjes presented the identical loan application to another lender, Bankers Wholesale. Bankers Wholesale fell for the story and made the loan to Younk. It turned out to be a sham from top to bottom: the owners of the property had never agreed to sell it; Younk never bought it; and not a penny of the loan money was ever paid to the current owners.

Based on these facts, the government indicted Grintjes for aiding and abetting a fraudulent scheme involving the interstate transfer of funds. The essence of Grintjes's defense was that he was just a go-between, that he had no reason

to suspect that the documents Younk and others supplied to him were fraudulent, and that he had been duped by Younk just as the lenders were. In his direct testimony, Grintjes claimed that he had been confident that Younk's deals were legitimate because all of the information that he had collected about Younk and the properties checked out. Grintjes made particular reference to the verification of deposit forms he received from Younk's banks. Because Grintjes's office had followed standard procedures in sending the forms to the banks to be filled out, said Grintjes, and because three separate banks had filled out the forms and vouched for Younk's creditworthiness, Grintjes asserted that he was confident that Younk was legitimate.

The government then cross-examined Grintjes about the verification of deposit forms, and Grintjes identified his signature on three of the forms attesting to the fact that the forms were being sent directly from Grintjes's office to the banks and had not passed through Younk's hands. Grintjes also testified that he personally sent at least one of the forms to the bank. In response to the prosecutor's suggestion that the bank verifications were forged, Grintjes testified that he had "no way to know" that the forms were forgeries.

In order to rebut Grintjes's testimony that he felt confident relying on the bank verification forms, the government decided to call employees from three different banks who were prepared to testify that their signatures on the verification of deposit forms were forged. One of the bank employees was also going to testify that the account numbers listed on the form did not even exist at her bank. According to the government, it was highly unlikely that Grintjes would have wound up with forged documents from three separate banks if he had actually followed standard procedures in processing the forms. This made it likely that Grintjes was lying about the procedures he followed in collecting the forms. It was the government's theory that Younk forged the forms and supplied them directly to Grintjes; if that were true, Grintjes would have had every reason to suspect Younk of foul play.

Grintjes objected to the admission of this testimony on two grounds. First, he argued that the testimony was not appropriate rebuttal evidence but was essentially an extension of the government's case-in-chief. According to Grintjes, he never denied that the documents were forgeries; he merely stated that he had no knowledge of whether they had been forged, so proof that the documents had been forged would not contradict or impeach his testimony.

Grintjes's second argument was that the evidence of the forgeries was potentially exculpatory in that it suggested that employees at the various banks may have been involved in Younk's scheme, and that as such, the government was required by Brady to turn the evidence over to Grintjes before trial. The district court admitted the rebuttal evidence over Grintjes's objection, and he now appeals that decision.

II

The proper function of rebuttal evidence is "to contradict, impeach or defuse the impact of the evidence offered by an adverse party." United States v. Papia, 560 F.2d 827, 848 (7th Cir. 1977). We review the district court's decision to allow rebuttal evidence for abuse of discretion. Mercado v. Ahmed, 974 F.2d 863, 872 (7th Cir. 1992). Grintjes testified that one of the reasons why he was confident that Younk's transactions were above-board was because he followed all the standard procedures in collecting the verifications of deposit from Younk's banks. He also testified that his office sent the forms to three different banks to be filled out, and that he personally sent one of the forms. The government had a different view of events: it wanted to persuade the jury that Younk actually supplied the forged forms directly to Grintjes and that the forms were never sent to the banks. Although the evidence that all three of the forms were forged did not rebut with certainty Grintjes's claim that he sent the forms to the banks properly, at the very least the evidence tended to show that he may have been lying about how he handled the forms. The government's evidence also undercut Grintjes's more general contention that he had no reason to suspect the Younk transactions were not legitimate.

Grintjes argues that, even if the testimony did contradict or defuse his testimony, it still should not have been admitted in rebuttal, because it was essentially a continuation of the government's case-in-chief. The government counters that, during its case-in-chief, it had no way to know whether Grintjes would testify at all, much less what he would say about the forms or anything else. The district court was well within the bounds of its discretion when it decided to accept the government's argument.

Finally, Grintjes argues that the bank employees' testimony should not have been admissible to prove that Grintjes lied about sending the forms to the banks, because the evidence could just as easily lead to the inference that people at the banks were responsible for the forgeries. We disagree. Even

if the evidence was not ironclad proof of Grintjes's wrongdoing, it nevertheless tended to show that Grintjes lied about whether he followed the standard procedures or whether he knew the forms were forgeries. If Grintjes believed a different interpretation of the evidence was more logical, he was free to argue his view, as he did, in closing. The evidence of the forgeries tended both to impeach Grintjes and to contradict his innocent explanation of his involvement in the scheme. Once again, the district court did not abuse its discretion in admitting the testimony as rebuttal evidence.

Grintjes's second contention, that the government had an obligation under Brady (which it violated) to turn the evidence of the forgeries over to him before trial, fares no better. Brady prohibits prosecutors from suppressing evidence "favorable to an accused" if the evidence is "material either to guilt or to punishment." 373 U.S. 83, 87 (1963). In order to establish a Brady violation, Grintjes must show "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996). We review the district court's decision on Grintjes's Brady claim for abuse of discretion. United States v. Kozinski, 16 F.3d 795, 818 (7th Cir. 1994).

Grintjes has not persuaded us that he meets the second of the Brady criteria: he has not shown that the evidence of the forgeries was "favorable to the accused." See United States v. Polland, 994 F.2d 1262, 1267 (7th Cir. 1993) (Brady does not require disclosure of evidence that is "more inculpatory than exculpatory."). The evidence to which Grintjes objected showed that documents that he had in his control, and that he certified were obtained through standard procedures, were in fact forged. As far as it went, this evidence could not have been affirmatively helpful to Grintjes. The best Grintjes can suggest is that if he had known of the forgeries before trial, he would have had the opportunity to investigate who was responsible for the forgeries, and then if he had been able to show that someone at the banks was responsible, that evidence would ultimately have bolstered his case.

This argument betrays a misunderstanding of the Brady rule. The government admits that if it had possessed any evidence tending to show that someone at the banks was behind the forgeries, it would have been required to turn that evidence over. But there was no such evidence. The evidence that the government did have showed only that the documents Grintjes swore were collected

from several banks using standard procedures were really forgeries. This was inculpatory evidence, not exculpatory.

Although the fact that the challenged evidence was not favorable to the defense is sufficient to dispose of Grintjes's Brady claim, we add for the sake of completeness that his argument would founder on other aspects of the Brady rule as well. Brady applies only where the allegedly exculpatory evidence was not disclosed in time for the defendant to make use of it. See, e.g., United States v. Adams, 834 F.2d 632, 634 (7th Cir. 1987). Grintjes argues that he was not provided with the alleged Brady evidence in time to make use of it in this case, because he had no time after he was confronted with the evidence during the government's rebuttal to investigate the genesis of the forgeries. But Brady does not require pretrial disclosure. United States v. Sweeney, 688 F.2d 1131, 1141 (7th Cir. 1982). It demands only that the disclosure not come "'so late as to prevent the defendant from receiving a fair trial.'" Adams, 834 F.2d at 634, quoting United States v. McPartlin, 595 F.2d 1321, 1346 (7th Cir. 1979). In Grintjes's case, the evidence was admitted at trial, and Grintjes had a full opportunity to make whatever arguments he wanted to make about the value of the evidence during his closing. Moreover, Grintjes did not seek a continuance at the time he learned of the evidence, which would have been the appropriate course if he felt he needed more time to investigate the exculpatory potential of the evidence. These facts cannot support a conclusion that the evidence was disclosed too late for Grintjes to make use of it.

Furthermore, this court has repeatedly held that Brady does not apply to evidence that a defendant would have been able to discover himself through reasonable diligence. See, e.g., Crivens v. Roth, 172 F.3d 991, 996 (7th Cir. 1999); United States v. Dimas, 3 F.3d 1015, 1018-19 (7th Cir. 1993). In this case, Grintjes had the verification forms in his possession well before trial; if he had been interested in investigating whether they were forged, he easily could have done so. In fact, the government seems to have discovered the forgeries simply by showing the forms to the bank employees and asking them whether they had signed the forms; there is no reason to think that Grintjes's attorneys could not have done the same thing if they thought the information was relevant.

Finally, a Brady violation requires a new trial only if there is a reasonable possibility that the outcome of the case would have been different had the evidence not been suppressed. See

Crivens, 172 F.3d at 996. On this point, Grintjes urges that the outcome of the case could well have been different if he had had the chance to investigate the forgeries. This, however, is pure speculation. Even under Grintjes's theory, earlier disclosure of the evidence of the forgeries could only have affected the outcome of the case if Grintjes's investigation of the documents had actually turned up evidence that the forgeries were committed by people within the banks; this possibility seems remote at best. Notably, many months have now passed since Grintjes became aware of the forgeries, yet Grintjes's counsel admits that no evidence that the forgeries were committed by bank employees has yet been uncovered. There is literally nothing to suggest that the government's failure to disclose the evidence of the forgeries sooner affected the outcome of the case in any way.

III

We conclude that there was no Brady violation in this case and that the district court did not abuse its discretion in permitting the government to introduce rebuttal evidence showing that the forms verifying the deposits were forged. The judgment of the district court is

Affirmed.