In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2491

United States of America,

Plaintiff-Appellee,

v.

Kevin C. Brown,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:00-CR-98-RL--Rudy Lozano, Judge.

Argued February 15, 2002--Decided May 10, 2002

   Before Rovner, Diane P. Wood, and Evans,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  After
threatening his ex-girlfriend and her
brother with a fully loaded assault
rifle, Kevin Brown was convicted of being
a felon in possession of a firearm and
ammunition and sentenced to 87 months'
imprisonment. On appeal, he challenges
the federal prosecutor's use of
peremptory challenges to strike three
African-American women, the district
court's refusal to admit evidence that a
witness had declined to take a voice
stress test, and the government's failure
to turn over to the defense in discovery
a firearms trace report. We find no fault
with any of these actions and therefore
affirm.

I

   In 1996, Brown's girlfriend, Joilyn
Moore, gave birth to their son Deantaye.
The two soon broke up and maintained only
infrequent contact. In early 2000, Brown
moved in with his mother, who lived
across the street from Joilyn, and he
began to see Deantaye again. On February
27, 2000, Brown cut Deantaye's hair at
the home of Joilyn's mother. At that
time, Joilyn asked Brown if he would come
over the next day and take a prescription
to be filled for Deantaye. Later in the

evening, Joilyn returned to her apartment alone.

That night, the door buzzer for Joilyn's apartment rang several times, but Joilyn ignored it because she was not expecting anyone. Minutes later, Brown began banging on her door and said he was there to pick up Deantaye's prescription. Joilyn refused to open the door and told him the prescription was at her mother's house. Brown accused Joilyn of lying, demanded to know who else was in the apartment, and eventually stormed off after warning her that she had better not come outside.

Joilyn (who had no telephone) went to a neighbor's apartment to alert her brother, Kelly Moore, to the situation. When Kelly arrived in his Suburban, Joilyn met him at his car and started to tell him what had happened. At that point, Brown drove through the apartment alley and got out of his car. Kelly told Joilyn to hide behind his Suburban and he and Brown began to argue. Kelly testified that Brown reached into his car and displayed a rifle covered by a sheet. In response, Kelly pulled back his shirt to reveal a 9 mm. pistol, which he was licensed to carry. After a few tense minutes of negotiation, the men agreed to put their weapons in their cars and fight hand-to-hand. When Kelly ran at Brown, Brown rushed to his car and called someone on a cell phone. With Brown thus distracted, Joilyn ran into her apartment building and called her aunt, who in turn notified the police.

When Officer John Basaldua arrived at the scene, he saw a black male sitting in the Suburban and Brown standing next to his car. At that time, Brown bolted. After a two block chase and brief struggle, Basaldua apprehended Brown. Thomas Pawlak, the second officer on scene, was following half a block behind and witnessed Basaldua activate his siren and turn down the alley. He also saw Kelly standing next to the Suburban and Brown's car, parked about 10 yards away. Kelly flagged down Pawlak and told him that Brown had threatened him with an assault rifle. The passenger window of Brown's car was rolled down, and a fully loaded assault rifle lay on the front seat.

II

Brown's first challenge is to the government's decision to exercise three of its six peremptory challenges to exclude African-American women. As to Camisha Lane, the Assistant U.S. Attorney alleged that he excluded her because she was an assistant school teacher and the youngest juror seated. The second African-American female, Dorothy Robinson, was initially challenged for cause both because her husband had been convicted in the 1970's of a crime involving a firearm and because she failed to disclose that fact on a written questionnaire. The third peremptory was used to strike Betty Hart. Hart had testified as a trial witness for her mother, who was acquitted of killing Hart's stepfather. The prosecutor also noted that Hart had testified against a former attorney who had defrauded her in a civil case. The district court accepted all three explanations as neutral and nonbiased. The seated jury consisted of five Caucasian females, four Caucasian males, two African-American males, and one Asian-American male.

The prosecution may not use a peremptory challenge to strike a juror on the basis of her race. Batson v. Kentucky, 476 U.S. 79, 89 (1986). To succeed on a Batson claim, the defendant must establish a prima facie case that a challenge has been used to exclude a juror based on race. If the prosecutor then articulates a race-neutral explanation, the trial court will permit the strike unless the defendant establishes that the proffered reason is pretextual. Id. at 98. The prosecutor's race-neutral explanation must be clear and reasonably specific to persuade the district court. Purkett v. Elem, 514 U.S. 765, 768 (1995). We review the district court's decision for clear error. Hernandez v. New York, 500 U.S. 352, 369 (1991).

The government struck Lane because she was a teacher. This court has previously upheld the striking of teachers, who are often thought to be especially sympathetic to defendants. United States v. Smallwood, 188 F.3d 905, 915 (7th Cir. 1999); United States v. Roberts, 163 F.3d 998, 998 (7th Cir. 1998). In Roberts, this court upheld an explanation that an African-American juror was excluded for

being a teacher even though a white teacher served on the jury because there was no evidence that defense counsel called that fact to the district court's attention. Roberts, 163 F.3d at 999. Here the Assistant U.S. Attorney specifically proffered that he would strike any teacher in the venire and no teachers were ultimately seated as jurors. In the face of this precedent, we see no clear error in the district court's acceptance of the government's explanation.

The reasons for striking Robinson and Hart appear to us not just race-neutral but close to the threshold necessary to strike for cause. Brown is correct that Robinson's husband's firearms conviction occurred over 20 years ago and that she felt the punishment was fair, but we have no trouble accepting that the prosecutor legitimately feared this past experience could nonetheless color her views. The belief that Hart might be pro-defendant because she had testified for the defense at her mother's murder trial seems ifanything even more justified. Since these explanations are race-neutral and far more than mildly persuasive, we reject Brown's Batson challenge.

III

At trial, Brown sought to cross-examine Kelly about his failure to appear for a scheduled voice stress test with Detective Cheryl Cooper. The district court sustained the prosecution's objection to this line of questioning, ruling that evidence of Kelly's refusal to take the test was irrelevant and that its prejudicial aspect would outweigh any probative value.

Brown contends that the district court abused its discretion by preventing him from informing the jury, through either cross-examination of Kelly or Cooper's testimony, of Kelly's failure to appear for the test. While this court has had no occasion to consider the use of a voice stress test in the criminal setting, such tests resemble a polygraph. Veazey v. Communications & Cable of Chicago, Ltd., 194 F.3d 850, 859 n.8 (7th Cir. 1999). A trial court's decision on whether to admit a witness's polygraph results is granted considerable deference. United States v. Lea, 249 F.3d 632, 638 (7th Cir. 2001). Furthermore, a defendant's

refusal to take a polygraph rarely is considered probative evidence of deceit at trial or sentencing. United States v. Pitz, 2 F.3d 723, 730 (7th Cir. 1993).

Results of polygraphs or voice stress analyzers generally are peripheral to the core issues of a case so long as the defendant has other opportunities to impeach the witness in question. United States v. Pulido, 69 F.3d 192, 205 (7th Cir. 1995). Under our deferential abuse of discretion standard on evidentiary rulings, see United States v. McCulley, 178 F.3d 872, 875 (7th Cir. 1999), the district court's Rule 403 balancing analysis is easily sustainable. Voice stress tests are if anything less reliable than polygraphs, and the evidence was simply that Kelly failed to show up for the interview without explanation, not that he had affirmatively refused to take the test. The jury therefore could have read more into this than there was. At the same time, Brown had ample opportunity to cross-examine Kelly on his failure to cooperate with Cooper's investigation as well as to point out other perceived inconsistencies in his description of his encounter with Brown. Compare United States v. Olson, 978 F.2d 1472, 1480 (7th Cir. 1992) (no abuse of discretion where "plethora of impeachment evidence" outside of polygraph available to challenge witness testimony). Thus, even if this evidence had some minimal probative value, the district court did not abuse its discretion by excluding it.

IV

Brown's final contention relates to his post-trial discovery that the Bureau of Alcohol, Tobacco, and Firearms had provided the prosecution with a firearms trace report of the rifle found in his car. Brown filed a motion for a new trial or an evidentiary hearing regarding this new evidence. The district court reviewed the trace report in camera, found that it contained no information favorable to Brown, and denied the motion.

Brown alleges on appeal that he is entitled to a new trial because the government failed to turn over the trace report in response to his discovery requests. Even if the government did withhold the report, however, Brown is

entitled to a new trial only if he can establish that the report is favorable to him and material to an issue at trial. United States v. Hartbarger, 148 F.3d 777, 786 (7th Cir. 1998). In his post-trial motion, Brown theorized that Kelly's name might appear on the trace report. That, however, is not the case. Brown still believes that the report is material because it contains the name of the last owner of the gun before it was stolen. With that information, Brown could determine if Kelly has any connection with that person or any previous owner. If so, that would increase the likelihood that Kelly possessed the weapon and planted it in Brown's car.

This is far too speculative a showing of materiality to support reversal. On its face, the trace report is not favorable to Brown; there is no indication that Kelly knew or had any connection to the last name on the report. A criminal defendant is not entitled "to embark upon an unwarranted fishing expedition through government files." United States v. Phillips, 854 F.2d 273, 278 (7th Cir. 1998). Evidence is not considered "favorable to the accused" if that evidence standing alone "could not have affirmatively helped the defendant." United States v. Grintjes, 237 F.3d 876, 880 (7th Cir. 2001). Simply because the trace report, if turned over, would have given Brown another lead to investigate does not mean that it was favorable evidence that the government must automatically disclose. Id.

Even if we were generously to construe the trace report as favorable, it is not material because there is no reasonable probability that the result of the proceeding would have differed had it been turned over. Id. at 881. Even if Kelly had some connection to the person from whom the gun was stolen, the jury would still have confronted testimony that Kelly was sitting in his vehicle when Basaldua drove off in pursuit of Brown and that when Pawlak, who was driving a half a block behind Basaldua, pulled up, Kelly was standing next to the vehicle and nowhere near Brown's car. Besides this, the whole idea that Kelly, upon receiving a call that his sister needed help, would bring with him two weapons only one of which he was licensed

to carry, engage in a lengthy standoff with an unarmed Brown, and then in the ten seconds or so between the departure of Basaldua and Brown and the arrival of Pawlak, rush over to Brown's car to plant the rifle and then back to his own vehicle, is preposterous. Under the circumstances, the district court's determination that the failure to disclose the trace report did not require a new trial was not an abuse of discretion.

V

For the foregoing reasons, the judgment of the district court is Affirmed.