# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 01-4242

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

NAZIH TADROS,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 349—**James F. Holderman,** *Judge*.

———————

ARGUED SEPTEMBER 26, 2002—DECIDED NOVEMBER 15, 2002

———————

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury found Nazih Tadros guilty of mail fraud and wire fraud for engaging in a scheme to defraud several insurance companies by submitting false information to them about a purported disability and his ability to work. The defendant claims that the government failed to disclose information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), that the government failed to prove the elements of the fraud beyond a reasonable doubt, and that the indictment was returned after the relevant statute of limitations had expired. We affirm.

## I.

Over the course of several years, Tadros submitted applications for insurance policies with four different insurance companies and applied for benefits under the terms of those policies. The government indicted Tadros alleging that he used mail and wire services to knowingly supply false information both in the applications for insurance coverage and for benefits under those policies in violation of 18 U.S.C. §§ 1341 and 1343, and 26 U.S.C. § 7206(1).

The fraudulent scheme was fueled by an April 5, 1993 car accident in which Tadros was rear-ended by another vehicle. The reporting police officer did not note any physical injuries to either party and recorded the physical condition of both parties as normal. Tadros sought treatment for neck and back pain the following day at a local emergency room. An x-ray of his neck and back revealed some arthritis and an old compression fracture, but nothing more. After an uneventful visit, Tadros was released with a prescription for a pain reliever and a muscle relaxant.

The crux of the government's allegation is as follows: in an effort to collect money from various insurance agencies which insured the defendant, Tadros fraudulently represented that the injuries he sustained in the August 1993 car accident were greater than they actually were, that these and other health problems prohibited him from working, and that his occupation required physical labor that he could not perform. The government contended that Tadros transmitted this fraudulent information by mail and wire in violation of 18 U.S.C. §§ 1341, 1343. Because the defendant claims that the jury's verdict was not supported by the evidence, below we review the relevant evidence elicited at the trial.

The evidence produced at trial indicated that Tadros was the owner and president of "Super Jet," a small Chicago grocery store. The fraud scheme had a recurring pattern:

when Tadros applied for insurance coverage he claimed he was the owner or manager of a grocery store who performed no manual labor. When applying for benefits under the policies, Tadros claimed he was a laborer in a grocery store—stocking shelves, unloading trucks, maintaining machinery, and working behind the meat counter. Tadros' employees testified that Tadros was the owner and boss who did the paper work in the store and did not perform manual labor. In addition, none of the testifying employees recalled that Tadros had missed work for any extended period of time other than for an occasional vacation.

The scheme to defraud involved four insurance companies: Mutual Trust Life Insurance Company ("Mutual Trust"), Fireman's Fund Insurance Company (Fireman's), New York Life Insurance Company ("New York Life"), and Prudential Insurance and Financial Services ("Prudential"). In November 1990, Tadros completed an application with Mutual Trust for a disability insurance policy describing his work duties as "office, traveling . . . no labor." (Tr. 383). Shortly thereafter, Mutual issued him a disability policy.

On August 6, 1993, Tadros filed a claim with Mutual for total disability benefits, stating that he had sustained neck and back injuries and a concussion in a car accident. On the disability form he described his job title as that of a clerk or store maintenance worker. He alleged both on the claim form and in an interview with a Mutual employee that his duties included manual labor such as unloading merchandise, building displays, and stocking shelves, and that he had not been able to return to work since the accident.

Although it refused to accept liability, in December 1993, Mutual Trust made a partial payment to Tadros while it continued to investigate his claim. After negotiating with his attorney, Mutual Trust subsequently settled the remainder of his claim in May, 1994, for $94,050.

Around the same time that Tadros submitted his disability claim to Mutual, he also filed a Worker's Compensation claim against Super Jet with the Illinois Industrial Commission. Fireman's insured Super Jet against work-related injury claims and Tadros claimed that he had been injured while on a work-related errand.[1] Fireman's required that Tadros see three different independent medical examiners regarding his claim of total disability. Each of the doctors came to varying conclusions about the condition of Tadros' back, neck, and shoulders, but all agreed on one thing—the defendant was not totally disabled and could perform the types of office work required of a grocery store owner or manager.

During his visits to the various medical examiners, Tadros continued to present fraudulent information about the nature and extent of his injuries and the nature of his job duties. Tadros told the first doctor, Dr. Gireesan that he had worked as a clerk at a grocery store, but that he was not currently working. During his initial exam of Tadros on December 1, 1993, Dr. Gireesan found that the defendant had an injury to the disk area between the vertebrae in his back and a grinding sensation in his shoulder, but he advised Tadros that he could continue with light work such as office work. Dr. Gireesan recommended that Tadros see another doctor, Dr. Monaco, regarding his shoulder pain. Dr. Monaco recommended left shoulder surgery which the defendant never sought. During a second visit to Dr. Gireesan, on January 6, 1994, the doctor diagnosed Tadros as having impingement syndrome of the left shoulder. He

---

[1] While Tadros' claims were pending with Fireman's, he filed a claim with his health insurance provider, BlueCross Blueshield of Illinois, seeking reimbursement for medical expenses which he incurred as a result of the car accident. He indicated on the claim form that the injuries were not work-related and that he had no other insurance.

advised Tadros to refrain from work until the pain was under control. During his final visit with Tadros, on May 17, 1994, Dr. Gireesan advised him that he could return to light duty work.

Next, Tadros saw Dr. Brackett. Dr. Brackett examined Tadros and some of his medical records and doubted the credibility of Tadros' reports of pain. He administered a few tests which indicated to Dr. Brackett that the defendant was malingering and exaggerating the extent of his pain. Dr. Brackett recommended that Tadros return to work without restriction.

The third independent medical examiner, Dr. Haskell, concluded, based on reviews of MRIs performed by other doctors, that although Tadros had some injury to his spine and shoulder, he was not totally and permanently disabled and could perform sedentary and light work, such as that of a store manager or clerk.

In 1993, Fireman's hired a company to conduct surveillance of Tadros in order to investigate his claim of disability. Over the course of several surveillance sessions, the private company observed Tadros leaving his house, driving, pumping gas, doing various errands, going to Super Jet for several hours at a time, and talking on the telephone at Super Jet.

Tadros' claim against Fireman's remained pending before the Illinois Industrial Commission until he voluntarily dismissed it in March, 2000.

Having successfully received $94,050 from Mutual on May 9, 1994, the very next day, Tadros signed a completed application for disability insurance with New York Life. The application consisted of several parts. On the first portion of the application, Tadros indicated that he was the manager of a grocery store. On the medical portion of the application, he indicated that the only prior medical treat-

ment he had received in the ten previous years was for high blood pressure. He claimed he had not received "advice about any treatment, surgery or diagnostic testing which was not completed." (Tr. 566). On a third portion of the application he indicated that he had been treated for "back, spine, or bone disorders" resulting from an accident on April 5, 1993, but that the condition had lasted for only "a few weeks." (Tr. at 564-65). New York Life issued Tadros a disability insurance policy in October 1994.

On February 10, 1997, Tadros made a claim against the New York Life disability policy alleging total disability. He claimed that he had been disabled since June 1996 from a combination of diabetes, high blood pressure, fatigue, and dizziness. Dr. George Georgelos, a chiropractor, certified his disability for this claim. Tadros did not ask his regular cardiologist, who he saw every few months, to certify his disability. Tadros also submitted a "Description of Occupation" form in May 1997 indicating that from 1994 until 1995 his primary job duties involved office work and bookkeeping and that from November 1995 through May 1996 his job duties changed to include maintenance, working as a meat man, some office work, stocking and loading.

After some investigation, New York Life refused to pay Tadros' claim, and instead rescinded his policy and returned his premiums.

The government also alleged that as part of the fraud scheme the defendant applied for and received a whole life insurance policy through Prudential Insurance and Financial Services ("Prudential"). The whole life policy allowed insureds to take loans against the accumulated cash value of the policy. It also included a provision which allowed the insured person to waive the insurance premiums if that person could demonstrate a disability. During any such waiver period, the policy continued to accrue cash value.

In the application for the whole life policy, Tadros described his occupation as "supermarket owner" with "general administrative and management" duties. (Tr. 498, 499). On October 29, 1993, Tadros applied for a waiver of his insurance premiums from Prudential, claiming that he was disabled due to neck and back pain. As was the case with the Mutual claim, when applying for the benefit, Tadros changed his job description to indicate that he worked as a clerk in a grocery store doing manual labor such as unloading trucks, mopping floors, stocking shelves, and fixing air compressors. He then claimed that after the accident he had no job responsibilities at Super Jet.

During an investigation of Tadros' claim, in an unannounced visit to Super Jet, the Prudential investigator found Tadros in his office. The defendant told the investigator that he had no specific reason for being at the store, that he had been a cashier but could not perform those job functions any longer due to his back pain, and that he was at work five days a week for three to four hours a day, even though he had no specific responsibilities. Despite this odd response to the investigation, on January 17, 1994, Prudential granted the waiver of premiums on Tadros' policy.

After Prudential granted the waiver, it required Tadros to submit periodic documentation of his continuing disability. He submitted one such form in June 1995, indicating that his health condition remained the same, that he was house-confined, and that he worked part-time doing paperwork. A doctor R.F. Senno certified the disability in an attending physician's statement. On the second continuing disability form, submitted in February 1997, the defendant claimed that he continued to be house-confined, that he did not work at all, and that his daily activities consisted of eating, sleeping, and lying in bed. Dr. Georgelos, the same doctor who certified the defendant's disability on the New York Life disability form, certified his continuing disability on the 1997 Prudential form. In January 1998, Tadros sub-

mitted a third disability statement to Prudential to continue his premium waiver, again claiming to be house-confined. In November 1998, he sent yet another disability statement and claimed that he was in constant pain in his shoulders and neck, was confined to his house, and had not been able to work for pay since the start of his disability in 1993.

After Prudential waived the premiums (and essentially began paying the premiums itself), the policy began to accumulate a cash value. Tadros took several loans against the cash value of his policy—in August 1997, December 1998, June 1999, and September 1999. By applying for these loans, Tadros caused Prudential to send him checks through the U.S. mail and by private express carrier. Tadros never repaid any of these loans.

During the time that Tadros claimed to be house-confined, in September 1996, surveillance experts observed the defendant leaving his house, driving to a bank, driving to Super Jet, and remaining inside Super Jet for extended periods of time. Surveillance videotape from June 1997, showed the defendant kneeling in front of his house and carrying brake rotors for a car. Surveillance from May 1998, showed the defendant driving to a hardware store, purchasing two forty-pound bags of cement, unloading the bags of cement from his car at his residence, laying a cement sidewalk, and smoothing the cement with a broom.

Despite Tadros' claim of total disability, the doctors upon whom Tadros relied for regular care during the time of his alleged home confinement had no record of such debilitating injury. For example, Dr. Jafar Al-Sadir, Tadros' cardiologist since 1995, testified that he treated Tadros for high blood pressure and high cholesterol and saw him approximately every three to four months during the relevant time period. During his initial visit in 1995, Dr. Al-Sadir gave Tadros a complete medical exam and found no abnormalities other than high blood pressure and obesity. Tadros

never told the doctor that he was house-confined and from 1995 to 2000 never asked him to certify that he was disabled. Sometime around April or May, 2001,[2] Tadros asked Dr. Al-Sadir to certify that he was disabled. Dr. Al-Sadir declined to do so, as he believed that from a cardiac standpoint Tadros was doing well.

On August 19, 1993, Tadros had an appointment with Dr. Cohen, a cardiologist at the University of Chicago hospital. During that visit the doctor performed a physical examination of Tadros and found nothing remarkable other than the fact that Tadros had high blood pressure and had gained weight. Tadros never complained of neck or back pain despite the fact that it had been less than five months since the car accident which had allegedly left him completely disabled.

In October 1997, during the time that Tadros claimed to be house-confined and completely disabled, the defendant went to see Dr. James Curran, an expert in rheumatology at the University of Chicago. Based on a physical examination, the doctor concluded that, other than some arthritis in a big toe, some degenerative arthritis in the lumbar spine, and bursitis, Tadros' exam was unremarkable. Tadros had a normal range of motion in all of his joints. The defendant did not ask Dr. Curran for a certificate of disability and did not return for a routine follow-up appointment.

Finally, the jury heard evidence that during the time the defendant claimed to be disabled he conducted personal business at various businesses in the Chicago area on hundreds of dates.

On July 23, 2001, the jury returned a guilty verdict against the defendant on ten of the eleven counts sent to the jury. Tadros appeals.

---

[2]  A grand jury indicted the defendant on April 12, 2001.

## II.

Tadros' first claim of error is that the government, in violation of *Brady*, failed to turn over audiotapes that Prudential made during telephone conversations with him. The government, however, did not have possession of the tapes at any point prior to the trial. Under *Brady*, the government must disclose evidence favorable to the defense where the evidence is material to either the guilt or punishment of the defendant. *Brady*, 373 U.S. at 87. A violation of the Brady rule occurs only when the government withholds evidence which, had it been disclosed, creates a reasonable probability that the result of the trial would have been different. *Strickler v. Greene*, 527 U.S. 263, 289 (1999). In order to establish a *Brady* violation, Tadros must show (1) that the government suppressed evidence, (2) that the evidence was favorable to his defense, and (3) that the evidence was material to an issue at trial. *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001).

The *Brady* rule does not apply to evidence not in the possession of the government that a defendant would have been able to discover himself through reasonable diligence. *See, e.g., id.*, *Grintjes*, 237 F.3d at 880; *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999); *United States v. Dimas*, 3 F.3d 1015, 1018-19 (7th Cir. 1993). This court has held many times that *Brady* does not require the government to gather information or conduct an investigation on the defendant's behalf. *See, e.g.*, *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997). The government did not suppress evidence in this case, and in fact, during pre-trial discovery tendered to Tadros a letter from a Prudential employee to the Federal Bureau of Investigation which disclosed, among other things, that Prudential had begun recording conversations with its insureds in late 1995. The government did not obtain any of these recordings for itself and did not have the duty to gather the tapes and tender them to the

defendant. *Brady* prohibits suppression of evidence, it does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel. *Senn*, 129 F.3d at 893. Tadros has offered no explanation for failing to procure the tapes himself and has never argued that he was somehow unable to obtain those recordings on his own.

Although the government's tender of the Prudential letter and the fact that the evidence was available to the defendant should resolve any issue regarding a potential *Brady* violation, we note that Tadros failed to meet any other of the requirements for a successful *Brady* claim. He has offered no evidence whatsoever to establish that the tapes would have been favorable to his defense. In fact, during oral argument, defense counsel conceded that the record was devoid of any evidence that would indicate that the tapes would be helpful to Tadros.[3] Nor did the defendant offer any evidence that the information on the tapes would be material to an issue at trial. The district court did not abuse its discretion in finding that the government had not withheld audiotapes in violation of *Brady.*

Next, Tadros asserts that the government failed to prove the elements of fraud beyond a reasonable doubt. On this claim, the defendant has a heavy burden to bear. In reviewing a claim for sufficiency of the evidence, this court must view the evidence in the light most favorable to the prosecution. *United States v. Fleischli*, 305 F.3d 643, 657 (7th Cir. 2002). We may reverse a conviction only when no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* The record must be

---

[3] At oral argument, counsel for the defendant insinuated that it was possible that an imposter had made the phone calls to Prudential. The record is completely devoid of any evidence of this claim.

devoid of any evidence, regardless of how it is weighed, from which a reasonable jury could find guilt beyond a reasonable doubt. *Id.*

In order to establish a violation of the mail or wire fraud statutes, the government must prove (1) that the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) the defendant used the mail (for 18 U.S.C. § 1341) or wires (18 U.S.C. § 1343) in furtherance of the fraudulent scheme. *United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001). The government presented ample evidence that the defendant participated in an intentional scheme to defraud insurance companies by applying for disability benefits, exaggerating the extent, if any, of his injury, and then making false representations about the nature of his job duties and his ability to work. Tadros altered the nature of his job duties when applying for disability benefits to claim that he performed manual labor when, in fact, he performed only office work. Similarly, he misled investigators who found him in his office at Super Jet, claiming that he had no official duties at the store. Tadros exaggerated the nature of his injuries, claiming, for example, to be house-confined when he was, in fact, out of the house running errands, visiting area businesses, performing physically taxing household duties, and running his own business. The information Tadros presented to the doctors certifying his disability differed from the information he supplied to the doctors who treated him on a regular basis. The government more than adequately established that the defendant used, or knowingly caused others to use the mail or wires in furtherance of the scheme. *See Schmuck v. United States*, 489 U.S. 705, 710-11 (1989). In short, the record contains an abundance of evidence from which a reasonable jury could find guilt beyond a reasonable doubt and we cannot, therefore, disturb the conclusions of the jury.

Finally, Tadros argued that any alleged scheme to de-fraud was complete when he received the final payments from Mutual Trust in May 1994, and consequently, the April 12, 2001 indictment came after the five-year statute of limitations for such crimes expired. *See* 18 U.S.C. § 3282. Tadros, however, continued to use the mail and wires to send fraudulent information to the victimized insurance companies long after May, 1994. The fact that the defen-dant failed to elicit more money from the insurance agen-cies is irrelevant; the government need not prove that the scheme to defraud was successful to prove a violation of the mail or wire fraud statutes. *United States v. Bach*, 172 F.3d 520, 522 (7th Cir. 1999); *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995).

For purposes of mail fraud and wire fraud, the five-year statute of limitations begins to run from the date of mailing of the fraudulent information. *United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999). Each mailing constitutes a separate offense. *Id.* at 847. The mailings in each of the counts on which Tadros was indicted occurred well within the five years prior to April 12, 2001. For example, the first count of the indictment alleges that Tadros sent a fraudu-lent statement of continuing disability to Prudential in February 1997. Tadros also sent fraudulent claims of con-tinuing disability to Prudential in January 1998, and No-vember 1998, and misrepresented his occupation on a form sent to Prudential in May, 1999. In response to the infor-mation sent by Tadros, Prudential sent him checks through the mail on August 22, 1997, December 30, 1998, June 8, 1999, and September 1, 1999.[4] Furthermore, the govern-

---

[4] Tadros need not have mailed the items himself to fall within the scope of the mail fraud statute. The statute also applies to any person who "knowingly causes" the fraudulent material "to be

(continued...)

ment presented sufficient evidence that Tadros faxed a Description of Occupation letter with fraudulent information to New York Life on May 20 1999, and on July 9, 1997, sent further fraudulent information by mail to New York Life. These ten mailings form the bases of the ten counts on which Tadros was convicted. Each of the ten fell within the five-year statute of limitations.[5]

## III.

For the reasons stated above, we affirm the judgment of the district court.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[4] (...continued)
delivered by mail" or private carrier. 18 U.S.C. § 1341. The government need only show that the defendant acted with knowledge that the use of the wires or mail could be reasonably foreseen or would follow in the ordinary course of business. *American Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999).

[5] For clarity, we note that the evidence of fraudulent activity occurring prior to April 12, 1996, though not within the relevant statute of limitations, is relevant to the government's proof that the defendant participated in a scheme to defraud and that he intended to defraud by using the mail and wires.